513 A.2d 541

Joseph Mikilak et al., Appellants *v.* Orthodox Church in America et al., Appellees.

Argued May 14, 1986, before President Judge CRUMLISH, JR. and Judges CRAIG, MACPHAIL, DOYLE, BARRY, COLINS and PALLADINO.

*Gene E. Goldenziel,* for appellants.

*Arthur L. Piccone,* with him, *Jonathan A. Spohrer,* for appellees.

OPINION BY JUDGE COLINS, July 29, 1986:

This case involves a dispute over the right to possession of church property of St. Basil's Russian Orthodox

Church of Simpson, Pennsylvania. Appellants are parish members of St. Basil's who seek relief from an injunctive order entered by the Court of Common Pleas of Lackawanna County granting possession of St. Basil's to the Orthodox Church in America[1] and other parties in interest (appellees). The congregation of St. Basil's seeks to leave the Orthodox Church in America and join the Russian Orthodox Church Outside of Russia (Church Abroad). They seek to do so because the Orthodox Church in America has initiated reforms in the Julian Calender utilized by that church, resulting in shifts of the time of worship of major holidays, which a majority of the congregation finds unacceptable.[2]

Because under neutral principles of law the right to possession of St. Basil's lies with the congregation, we will reverse the lower court and vacate its injunction order. Since the underlying controversy has its roots in antiquity, a brief review of the history of the jurisdictional dispute over Russian Orthodoxy in America may prove helpful to the reader.[3]

---

[1] This case was initially appealed to Superior Court, which ordered the matter transferred to Commonwealth Court pursuant to our non-profit corporation jurisdiction under 42 Pa. C. S. §762. *See Orthodox Church in America v. Mikilak*, 344 Pa. Superior Ct. 182, 496 A.2d 403 (1985).

[2] Christmas, a holiday celebrating the birth of Jesus Christ, was traditionally worshipped on January 7th by members of St. Basil's. Under the new calendar, December 25th would be the day Christmas is celebrated.

[3] The subsequent discussion is largely drawn from T. Ware, the Orthodox Church (9th printing, 1980). For other judicial discussions of Russian Orthodoxy, *see Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952); *St. Michael Archangel and Russian Orthodox Greek Catholic Church v. Uhniat*, 436 Pa. 222, 259 A.2d 862 (1969), *cert. denied*, 400 U.S. 823 (1970); *St. John Chrysostom Greek Catholic Church v. Elko*, 436 Pa. 243, 259 A.2d 419 (1969), *cert. denied sub nom. Dober v. Elko*, 399 U.S. 920 (1970).

## I. History of Russian Orthodoxy

In 1054, a formal schism ensued between the Eastern and Western branches of Christianity when the Bishop of Rome, Pope Leo IX, and the Patriarch of Constantinople, Michael Cerularius, exchanged decrees of excommunication and anathema. This schism resulted in the formal creation of the Orthodox and Catholic churches.

Prior to formal schism, Rome and Constantinople were involved in rival missionary activities. The practice among the Eastern missionaries was to convert to the Orthodox faith in the native tongue of the populace and encourage the development of Orthodox churches closely allied to the national identity of the people.

In the Ninth Century A.D., St. Cyril and St. Methodius first converted Moravians, Bulgarians, Serbs, and Russians to the practices of Orthodox Christianity utilizing a dialect of Slav spoken by Macedonians known as Church Slavonic. In 988, the Russian ruler, Vladimir, married Anna, sister to the Byzantine emperor. Vladimir was converted to Orthodoxy and proclaimed Orthodoxy the state religion of Russia, which it remained until 1917. Church Slavonic became the official language of the holy books and service books of Russian Orthodoxy.

On April 7, 1453, hordes of Turks began a seven-week long siege of Constantinople, which culminated on May 29, 1453, in the fall of Constantinople to the Turks and the death of the last Byzantine emperor, Constantine XI. With the extinction of the Byzantine Empire, Russian potentates assumed Byzantine titles of "autocrat" and "tsar" and adopted the state emblem of the double-headed eagle of Byzantium. Moscow became known as "the third Rome," after Rome and Constantinople. At this point, in 1453, the Russian Orthodox Church became formally autocephalous.[4]

---

[4] The autocephalous churches were traditionally the Russian, Rumanian, Serbian, Greek, Bulgarian, Georgian, Cypriot, Polish,

The Bolshevik revolution and its aftermath resulted in a diasporic scattering of more than a million Russian Orthodox clergy and laity, many of them drawn from the cultural and intellectual elite of the Russian nation. This diaspora coincided with a 1920 decree by Archbishop Tikhon, then the titular Patriarch of Russian Orthodoxy, for Russian bishops in exile to set up temporary organizations of their own in the event that normal relations could not be maintained with the Russian Patriarchate. In the seven years that followed, a number of conflicting synods, sobors (councils) and decrees ensued within and without Russia, resulting in the creation of several rival jurisdictions of Russian Orthodoxy claiming hierarchy over Russian Orthodox practitioners living outside of Russia.[5]

Consequently, Russian Orthodox faithful living outside of Russia could turn to the sovereignty of at least four different groups.[6] These were:

---

Albanian, Czechoslovakian, and Sinai Orthodox Churches. Finland, Japan and China are autonomous churches, meaning not formally autocephalous. The heads of the Russian, Rumanian, Serbian and Bulgarian churches are known as "Patriarchs," but these patriarchs are not to be confused with the titular head of all Orthodoxy, the Ecumenical Patriarch of the ancient Patriarchate of Constantinople, or with the heads of the other ancient Patriarchates of Alexandria, Antioch, and Jerusalem, who are also accorded the title Patriarch. In fact, Russian Orthodoxy was not headed by a Patriarch from 1700 to 1917, the so-called "synodical period" initiated by Peter the Great, borrowed from Protestant Church governments utilized in Germany. The Moscow Patriarchate was resuscitated in 1917 in response to efforts to reform the church.

[5] In 1925, Tikhon died in captivity. His successor, Sergius, in 1927 proclaimed a decree uniting the Patriarchal Church with the Soviet state. This particular event drove many exiles to feel that the break with Moscow had become permanent.

[6] See Ware, *The Orthodox Church* (9th printing, 1980) at 180-99. In addition, there are the Uniate groups which practice Orthodox rituals but pledge fealty to Rome, and the independent Orthodox Churches which recognize no formal hierachy at all. *See St. John Chrysostom Greek Catholic Church of Pittsburgh v. Elko,* 436 Pa. 243, 259 A.2d 419 (1969).

(1) The synod of the Russian Church in Exile, also known as the Russian Church Outside Russia (Church Abroad);

(2) The Moscow Patriarchate (Patriarchal Church);

(3) The Russian Archdiocese of Western Europe, under the jurisdiction of the Ecumenical Patriarchate (Paris Church);

(4) The Orthodox Church in America, formerly the Metropolia (Orthodox Church in America).

In 1970, the Moscow Patriarchate extended autocephaly to the Orthodox Church in America.[7] The Orthodox Church in America and the Church Abroad currently remain the principal components of the "Russian Orthodox" faith on the North American continent.

## II.   ST. BASIL'S HISTORY

The present dispute involves an attempt by the congregation of St. Basil's to disassociate itself from the Orthodox Church in America and join the Church Abroad.

St. Basil's was founded in 1904 and a church edifice was erected, dedicated to the uses and purposes of the North American Russian Orthodox Church. The property was conveyed by recorded deed in 1905 to the Russian Orthodox Church of St. Basil's in Simpson, Pennsylvania, and the Right Reverend Bishop Tikhon, Russian Orthodox Bishop of North America and the

---

[7] This agreement has never been formally recognized by the Ecumenical Patriarch of Constantinople, or by other Orthodox Churches operating in the Americas. Consequently, despite its title, the Orthodox Church in America remains a church for Russian Orthodox only. Other Orthodox churches, *e.g.*, Greek, Albanian, Serbian, each continue under their own American jurisdictional set-ups, in some cases as dioceses of the national autocephalous churches in Europe, or in other cases reporting directly to Constantinople, as the case may be.

Aleutian Islands. Bishop Tikhon conveyed his interest to Archbishop Platon Rozdestevensky by recorded deed in 1909, who in turn conveyed the interest to Bishop Alexander Nemelovsky by recorded deed in 1915.[8]

In 1924, St. Basil's was incorporated as the St. Basil Russian Orthodox Greek Catholic Church of Simpson, Pennsylvania. The corporation was "formed for the purpose of the worship of Almighty God, according to the faith, doctrine, creed, discipline, and usages of the Russian Orthodox Church." The incorporation document goes on to state that:

> Any property, real or personal, which shall hereafter be bequeathed, devised or conveyed to said corporation shall be taken and held, to enure [sic] to it, subject to the control and disposition of the lay members thereof, or such constituted officers or representatives thereof, as shall be composed of a majority of lay members.

No reference to the Diocese of North America and the Aleutian Islands of the Patriarchal Russian Orthodox Church is present in the incorporation document. There is no reference to the deeds executed in 1905, 1909, and 1915.

------

[8] Tikhon was Archbishop of North America for nine years (1898-1907). *See* Ware, *The Orthodox Church* (9th printing, 1980) at 188. Archbishop Rozdestevensky was Tikhon's successor as Archbishop of North America. However, his successor was Archbishop Eudokim, who returned to Russia in 1917 permanently. The deed identifies Bishop Nemelovsky merely as a Bishop of the Russian Orthodox Catholic Church of North America. From 1917 to 1934, no Archbishop presided over North America pursuant to appointment by the Patriarchal Church. In 1934, Benjamin Fedchenkoff was appointed by the Patriarchal Church as Archbishop of North America and the Aleutian Islands. *See Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94, 95-106 (1952).

In 1927, an equity decree issued from the Court of Common Pleas of Lackawanna County vesting title to the church property solely in the name of the corporate congregation. The interest of Bishop Nemelovsky was conveyed in toto to the church congregation.

In 1937, St. Basil's adopted by-laws which stated in part that:

> All parish property shall belong and so specify in the charter to all of the members of the parish.
> . . . All property of the Simpson Russian Orthodox parish as the church, rectory, school and cemetery were built and acquired by Russian Orthodox people.

Prior to 1956, St. Basil's had never recognized the American diocesan hierarchy of either the Church Abroad or the predecessor to the Orthodox Church in America, the Metropolia. In 1956, by majority vote of the congregation, St. Basil's voted to affiliate with the Metropolia. This move was resisted in litigation instituted by the North American diocese of the Patriarchal Church in 1957, but was ultimately settled and the congregation was permitted to alter affiliation.

In 1970, the Metropolia was recognized by the Moscow Patriarchate as an autocephalous church, to be known as the Autocephalous Orthodox Church in America. This was accomplished by means of an agreement executed on March 31, 1970, and a Patriarchal Tomos (declaration) issued April 10, 1970. The net effect of these agreements was to abolish the old Patriarchal diocese of North America and substitute in its place the jurisdiction of the Orthodox Church in America. The agreement was subject to a number of jurisdictional specifications and limitations. Specifically, Article VI of the Agreement, relating to property of the Metropolia, stated:

The Patriarchate agrees that the Metropolia after the proclamation of its autocephaly shall have exclusive jurisdiction over all property, real and personal, tangible and intangible, in continental North America and Hawaii which is now owned either by the Metropolia or by any corporation or other organization supervised or controlled by or in connection with the Metropolia. . . . St. Basil's is not specifically referred to or mentioned in this document.

In 1982, when the Orthodox Church in America voted to change its holiday celebration calendar,[9] St. Basil's voted by simple majority to leave the Orthodox Church in America and join the Church Abroad, which continues to adhere to the old-style Julian calendar. This brought about the institution of this action, and the entry of the injunction below.

### III. NEUTRAL PRINCIPLES

Our Supreme Court in *Presbytery of Beaver-Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*, 507 Pa. 255, 265-66, 489 A.2d 1317, 1323, *cert. denied,* U.S. , 106 S.Ct. 198 (1985), ruled that where the resolution of a property dispute between members of a religious association involves no inquiry into ecclesiastical questions, courts of this Commonwealth are to apply the same principles of law as would be applied to non-religious associations. This so-called "neutral principles" approach represents the most current view of the U.S. Supreme Court as to what arguments courts may constitutionally entertain in light of the First Amendment[10] when they

---

[9] *See* note 2 and accompanying test.

[10] *See* PA. CONST., art. I, §3. *See also* A. Adams and W. R. Hanlon, "Jones v. Wolf: Church Autonomy and the Religion Clauses of the First Amendment," 128 U. Pa. L. Rev. 1291-1339 (1980).

are asked to settle property disputes between members of a religious association. *See Jones v. Wolf*, 443 U.S. 595 (1979).

It is apparent from the record that the Chancellor erred in granting the injunction to appellees. Under a neutral principles approach, the burdened party, in this case the appellees who sought and were granted an injunction, would have to demonstrate either (1) an actual transfer of property from the congregation to the hierarchial church body or (2) clear and unambiguous language or conduct evidencing intent on the part of the congregation to create a trust in favor of the hierarchial church body.

First, with repect to actual transfer of property, the church corporation of St. Basil's has never surrendered its right to possession or legal title to the church property. The 1927 decree and the 1937 congregation by-laws confirm the church corporation's right to possession and legal title. Legal title and the right to possession did not pass in 1956, as no conveyance by deed or otherwise was ever executed. Nor could legal title and the right to possession be conveyed by the Autocephalous Agreement of 1970, as the Patriarchal Church had been divested of its interest in St. Basil's property since 1927 and could not convey what it did not possess.[11]

With respect to a trust, appellees did not meet their burden of showing that the congregation clearly and unambiguously intended to create a trust in favor of the Orthodox Church in America. The St. Basil's congregation's conduct and stated intent as expressed in its changes of allegiance in 1956 and 1982, and in its legal moves to confirm congregational ownership of property

---

[11] The Autocephalous Agreement of 1970 did not create a trust either for the simple reason that it created no new rights with respect to the property of St. Basil's. The Patriarchal Church had no rights to cede to the Orthodox Church in America.

in 1924, 1927, and 1957, belie any imputed intent to create a trust in favor of the Orthodox Church of America. The parish by-laws and the incorporation documents explicitly vest control of church property in the hands of the congregation. Paragraph two (2) of the incorporation documents makes reference only to the Russian Orthodox Church generally, and this does not create a trust in appellees' favor in light of the highly ambiguous nature of the term "Russian Orthodox Church."

Looking to Church documents, appellees could maintain that a trust was created by ratification of hierarchy by-laws. The Orthodox Church in America is governed by the statute of the Orthodox Church in America (the statute). Article X, Section Eight (8) of the statute states:

a) The parish or parish corporation is the sole owner of all parish property, assets, and funds. In administering them, however, the parishioners and officers elected by them must always remember the religious nature, purposes and goals of the parish and act as trustees of God's, not man's, property. The parish, as the whole Church, serves God and cares for God's work in the world, and all decisions concerning parish property must be inspired by that care and by the spiritual needs of the Church.

b) If the parish is abolished, its property is disposed of following the provisions of the parish by-laws. If no such provisions exist, the property is at the disposition of the diocesan authority. In all cases the sacred and untouchable items: the Holy Antimension, the Tabernacle and the Sacred Vessels must be surrendered to the Diocesan Bishop.

At best, portions of this language evidence only an ambiguous intent to create a trust. By contrast, other portions state unambiguously that the parish corporation is the sole owner of all parish property, assets, and funds (with the exception of the specifically-designated items of worship), and that if the parish is abolished, property is to be disposed of by reference to the parish by-law.

These few passages drawn from the statute are "far from constituting the clear unequivocal evidence necessary to support a conclusion that a trust existed." *See Presbytery of Beaver-Butler*, 507 Pa. at 270, 489 A.2d at 1325.

Moreover, in reaching our conclusion, we are guided by the thoughtful and able opinion in dissent of Judge WIEAND of the Superior Court. *See Orthodox Church in America v. Mikilak*, 344 Pa. Superior Ct. 182, 496 A.2d 403 (1985). Although we do not expressly adopt his opinion as a basis for our decision, we agree with the gist of his analysis that St. Basil's exercises congregational control and ownership over its church property and that appellees have failed to sustain their burden of showing a right to possession by proving that the property of St. Basil's was held by the congregation in trust for the church.

For the above reasons, the decision of the Court below shall be vacated and remanded for the entry of an appropriate decree.

## ORDER

AND NOW, this 29th day of July, 1986, the order of the Court of Common Pleas of Lackawanna County, No. 82, Equity, 1982, filed December 8, 1982, is hereby reversed in part and affirmed in part.

The Final Decree of the Chancellor is reversed insofar as it relates to all property other than "Holy Antimension, the Tabernacle, and the Sacred Vessels."

The matter is remanded to the Court of Common Pleas of Lackawanna County with directions that the Chancellor issue a Final Decree consistent with this opinion.

Jurisdiction Relinquished.