538 A.2d 632

Orthodox Church of America et al., Appellants *v.* Thomas Pavuk et al., Appellees.

Argued December 17, 1987, before Judges COLINS, PALLADINO, and Senior Judge KALISH, sitting as a panel of three.

*Arthur L. Piccone*, with him, *Ronald V. Santora, Hourigan, Kluger, Spohrer & Quinn*, for appellants.

*Gene E. Goldenziel, Needle and Goldenziel*, for appellees.

OPINION BY JUDGE COLINS, March 1, 1988:

We here consider a dispute over the right of possession and control of certain church property known as St. John The Baptist Russian Orthodox Church in Mayfield, Pennsylvania (St. John's). Appellants, the Orthodox Church of America, Diocese of Eastern Pennsylvania, its Hierarch, Bishop Herman, and other parties of interest, seek review of an order[1] of the Court of Com-

---

[1] The trial court had earlier denied appellants' request for preliminary injunctive relief which sought to restrain appellees' use and occupation of the property, their depletion or conversion of assets and their performance of services by clergy other than those recognized by the Orthodox Church of America.

mon Pleas of Lackawanna County which vested control of the property in appellees, parish members of St. John's who had voted to disassociate from the Orthodox Church of America and affiliate with the Russian Orthodox Church Outside of Russia (Church Abroad). The matter is strikingly similar to a church property dispute considered by this Court in *Mikilak v. Orthodox Church in America*, 99 Pa. Commonwealth Ct. 264, 513 A.2d 541 (1986), *allowance of appeal denied*, 515 Pa. 602, 528 A.2d 958 (1987), which involved another secessionist congregation of the Orthodox Church in America desiring to join the Church Abroad. Indeed, the impetus for appellees' realignment in the instant matter was the same as in *Mikilak:* a proposed revision by the Church Hierarchy of its Julian Calendar by which the dates of certain Holy Days would be altered,[2] a modification found unacceptable by appellees.

Constrained as we are to consider this matter by "neutral principles of law," *see Mikilak,* and after a thorough review of the extensive testimony and documentation proffered by both parties, we conclude that the trial court properly vested the right to possess and control parish assets in appellees.

## I. Factual Background

We will not now discuss the ecclesiastical history and polity of Russian Orthodoxy, amply *set forth in Mikilak*. For our purposes, the following facts are relevant. In 1902, St. John's, then known as the Greek Catholic Church of St. John The Baptist and comprised of persons not party to the instant litigation, was granted affiliation with the Russian Orthodox Church under

---

[2] For example, Christmas, traditionally celebrated by the parish on January 7, was transposed to December 25 by the proposed calendar revision.

the authority of Bishop Tikhon, the Russian Orthodox Bishop of North America. The parish incorporated in 1907 "for the purpose of worship of Almighty God according to the faith, doctrine, creed, discipline and usages of the Holy Orthodox Church, under the jurisdiction of the Russian Orthodox Bishop appointed by the Holy Synod in Russia or its administrators." The Articles of Incorporation[3] further provide:

> Any property, real or personal, which shall hereafter be bequeathed, devised or conveyed to said Corporation shall be taken and held to enure [sic] to it subject to the control and disposition of the Board of Trustees elected by the adult members of the congregation, a majority of which Board shall be composed of lay members of the congregation and citizens of the State of Pennsylvania.

In 1951, a majority of the parish voted to join the Russian Orthodox Church in America, conveying such intention by letter to His Eminence, The Most Reverend Leonty, Metropolitan of America and Canada. Of relevance here, the letter[4] also expressed the parish's

---

[3] The comparable document in *Mikilak* provided that the corporation was "formed for the purpose of the worship of Almighty God, according to faith, doctrine, creed, discipline and usages of the Russian Orthodox Church" and further stated, as to the disposition of church property:

[a]ny property, real or personal, which shall hereafter be bequeathed, devised or conveyed to said corporation shall be taken and held, to enure [sic] to it, subject to the control and disposition of the lay members thereof, or such constituted officers or representatives thereof, as shall be composed of a majority of lay members.

[4] This letter pertinently provides:

The decision of the meeting was as follows: The parish acknowledges (accepts) Metropolitan Leonty as its Spiritual Head and Leader, but that his power (authority) does

intent that control of all real and personal property would be retained by the local church council despite the realignment. By letter, Metropolitan Leonty accepted the parish into the Church, then indicating that the conditions upon which the parish would accept such membership could be "worked out" at a later date. There is no evidence, as the trial court determined, that these conditions of affiliation were subsequently defined.

Faced with the proposed objectionable revisions in the Church calendar, appellees voted in 1982 to disassociate from the Orthodox Church of America and to affiliate with the Church Abroad. Appellants thereafter filed an equity action in the trial court requesting, in essence, an award of title to, and control over, all assets retained by appellees. As we have indicated, the trial court denied preliminary relief and, after a hearing, issued an adjudication vesting control of the contested property in appellees and dismissing appellants' complaint. The trial court found "not a scintilla" of evidence that appellees relinquished control of parish assets to appellants. Their appeal followed.

## II. Discussion

Preliminarily, we note that the trial court properly avoided inquiry into ecclesiastical matters, adhering instead to the "neutral principles" approach delineated in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969). As our Supreme Court stated in *Presbytery of Beaver-Butler of the United Presbyterian*

---

not (extend over) encompass the movable and immovable properties, such as the parish buildings, the land, all financial monies, and institutions. These are wholly under the supervision of the Church Council.

*Church in the United States v. Middlesex Presbyterian Church,* 507 Pa. 255, 261-62, 489 A.2d 1317, 1320-21, *cert. denied,* 474 U.S. 887 (1985), "[a]ll disputes among members of a congregation . . . are not doctrinal disputes. Some are simply disputes as to meaning of agreements on wills, trusts, contracts, and property ownership." Such disputes, involving principles of civil law, may be resolved upon consideration of neutral principles "without intruding into the sacred precincts." *Id.* at 262, 489 A.2d at 1320-21. However, where the resolution of the issue involves questions of discipline, faith, ecclesiastical rule, custom or law, a civil court must defer to the highest church adjudicatory to which the question has been carried. *Id.* at 259, 489 A.2d at 1319. The instant matter is consonant with the former approach, as applied in *Mikilak.* For entitlement to relief, we there required the burdened party, here appellants, to demonstrate either (1) an actual transfer of property from the congregation to the hierarchical church body or (2) clear and unambiguous documentary evidence or conduct on the part of the congregation evincing an intent to create a trust in favor of the hierarchical church body.

As to the first element of the test defined above, requiring an actual transfer of property, it is clear that St. John's has never relinquished its right to possession or legal title to the church property. Despite the negotiations accompanying each change of affiliation, no conveyance by deed or otherwise was ever executed by appellees. Indeed, each affiliation was accompanied by documentation succinctly expressing the parish's intention to retain control of its property.

Such documents defeat appellants' argument that St. John's intended to create a trust in favor of the Orthodox Church of America. Beginning with the 1907 Articles of Incorporation, and reiterated in the 1951

communication to Metropolitan Leonty,[5] appellees clearly expressed their desire to retain all property in the corporate name. Moreover, the parish bylaws of 1962 explicitly state that: "[a]ll property . . . shall duly remain the sole property of said Congregation and church," which is not transferable absent majority vote of the parish.[6] In *Mikilak*, we rejected the suggestion that the statute of the Orthodox Church in America supported the implication of the creation of a trust in appellants' favor. That statute, of course, also governs the instant matter and provides, in pertinent part:

a) *The parish or parish corporation is the sole owner of all parish property, assets, and funds.* In administering them, however, the parishioners and the officers elected by them must always remember the religious nature, purposes and goals of the parish and act as trustees of God's, not man's, property. The parish, as the whole Church, serves God and cares for God's work in the world, and all decisions concerning parish property must be inspired by that care and by the spiritual needs of the Church.

b) *If the parish is abolished, its property is disposed of following the provisions of the parish by-laws.* If no such provisions exist, the property is at the disposition of the diocesan authority. In all cases the sacred and untouchable items: the Holy Antimension, the Tabernacle and the Sacred Vessels must be surrendered to the Diocesan Bishop. (Emphasis added.)

---

[5] We here repeat that the parish's letter acknowledged Metropolitan Leonty's leadership in spiritual matters but specifically rejected his authority over parish assets.

[6] The parish by-laws of 1955, superseded by the latter provision, contain a substantially similar provision.

In *Mikilak,* we interpreted such provisions to evidence, at best, only an ambiguous intention to create a trust. We found any such implication overridden by the decisive language designating the parish corporation as the sole owner of all property, with the exception of certain items of worship, to be disposed of pursuant to the parish bylaws if the parish is abolished. We see no reason to vary our conclusion in the instant matter; indeed, we read the statute as supporting the appellees' position. However, the instant matter is factually distinguishable from *Mikilak* in regard to certain language contained in the respective Articles of Incorporation of each congregation. In *Mikilak,* such language stated the congregation's purpose as the "worship of Almighty God, according to the faith, doctrine, creed, discipline and usages of the Russian Orthodox Church." We refused to interpret such language as creating a trust in favor of that denomination, particularly "in light of the highly ambiguous nature of the term 'Russian Orthodox Church'." 99 Pa. Commonwealth Ct. at 274, 513 A.2d at 546.

The Articles of Incorporation *sub judice* define St. John's purpose as the "worship of Almighty God according to the faith, doctrine, creed, discipline and usages of the Holy Orthodox Church, under the jurisdiction of the Russian Orthodox Bishop appointed by the Holy Synod in Russia or its administrators." Appellants now contend, as they did before the trial court, that such language creates a trust in favor of any *successor* of the Holy Orthodox Church as so defined, appellants, of course, claiming to be such successor. Judge Cottone correctly rejected this argument for two reasons, the first of which[7] we find dispositive: that such language is

---

[7] Secondly, the trial court refused to entertain this argument because it entailed a determination as to which body was in fact the ecclesiastical successor as so defined, an analysis which, in its view, was proscribed by *Blue Hull.*

ambiguous and, therefore, cannot be so interpreted. While the Articles of Incorporation do reference the Holy Orthodox Church, they also clearly provide that "[a]ny property, real or personal, which shall hereafter be bequeathed, devised, or conveyed to said Corporation [appellees] shall be taken and held to inure to it subject to the control and disposition of the Board of Trustees elected by the adult members of the Congregation. . . ." Read *in toto* the language does not demonstrate the stringent specificity requisite to an interpretation that the author intended a trust to be created. We thus reject appellants' contention that the purported hierarchical structure of the denomination compels an award of title in their favor. Regardless of the form of government of the church in question, we must examine the relevant deeds, contracts or other evidence to determine ownership of the disputed property. *Middlesex; Presbytery of Donegal v. Calhoun,* 99 Pa. Commonwealth Ct. 300, 513 A.2d 531 (1986).

Having done so, we find that appellants have not carried their burden of demonstrating an actual transfer of property nor unequivocal evidence that a trust existed and conclude that the trial court properly vested ownership and control of the real and personal property in a majority of the adult parish members of St. John's. Moreover, we find no support for appellants' contention that the vote of the parish to disassociate from the Orthodox Church of America was procedurally invalid.

Accordingly, the Order of the Court of Common Pleas of Lackawanna County is affirmed.

### Order

And Now, this 1st day of March, 1988, the Order of the Court of Common Pleas of Lackawanna County in the above-captioned matter is affirmed.