## Morrison v. Diocese of Altoona-Johnstown

C.P. of Westmoreland County, no. 1236 of 2004.

*Helen R. Kotler,* for plaintiff.
*Eric N. Anderson* and *Carol A. Eck,* for defendant.

ACKERMAN, *P.J.,* October 20, 2004—Before the court are preliminary objections filed by the defendants, Diocese of Altoona-Johnstown, Bishop Joseph H. Adamec, Bishop James Hogan, Benedictine Society a/k/a Benedictine Society of Westmoreland County a/k/a St. Vincent Archabbey, and Archabbot Douglas Nowicki, collectively referred to as the Diocesan defendants and/or the Benedictine defendants, to the complaint filed by the plaintiff, John Morrison. Plaintiff has also filed a preliminary objection to the defendants' preliminary objec-

tions based upon the statute of limitations. For the reasons that follow, the preliminary objections will be sustained in part and overruled in part.

The primary allegations of plaintiff's complaint stem from alleged sexual abuse of plaintiff by Father Alvin T. Downey that occurred in approximately 1980 and 1981 when plaintiff was 16 and 17 years of age. (Compl. ¶¶2, 3.) Plaintiff met Father Downey when Father Downey was substituting for a vacationing priest at St. John the Evangelist Catholic Church and plaintiff served as an altar boy. (Compl. ¶¶29, 38, 39, 42.) Plaintiff alleges that he was abused by Father Downey in approximately May of 1980 at the residence of plaintiff's mother. (Compl. ¶¶45, 46.) Plaintiff further alleges that he was sexually abused by Father Downey, Father Athanasius Cherry and Father Andrew Campbell as a group when plaintiff visited St. Vincent Archabbey in April of 1981. (Compl. ¶¶51, 53.) Plaintiff alleges that in March of 2002 he became aware that the Diocesan and Benedictine defendants "concealed sexually abusive conduct by Benedictine priests and others assigned to the Diocese, knew about abusive priests in the Diocese both before and after the plaintiff was abused, continued to conceal said misconduct, failed to effectively act on information regarding the misconduct of the aforesaid priests, all of which aided, enabled, encouraged and resulted in priests causing injuries to the plaintiff." (Compl. ¶59.) These allegations form the basis of the first 15 counts of plaintiff's 18-count complaint.[1]

1. These counts include (Count I) statutory violation/negligence per se; (Count II) common-law duty of reasonable care; (Count III) breach of fiduciary duty; (Count IV) failure to provide a safe and secure environment in the Diocese; (Count V) failure to provide a safe

Plaintiff's allegations that form the bases of the remaining three counts[2] of plaintiff's complaint surround events that occurred in 2002 and 2003. Plaintiff disclosed the alleged abuse by Fathers Downey, Cherry and Campbell to his mother on July 2, 2002. (Compl. ¶43.) On July 22, 2002, the plaintiff met with Bishop Adamec and Archabbot Nowicki to advise them of the past abuse and to discuss plaintiff's emotional and psychological condition. (Compl. ¶¶65, 262.) At this meeting, plaintiff was accompanied by his mother and a local physician, who came to support the plaintiff. (Compl. ¶65.) Through Bishop Adamec and Archabbot Nowicki, defendants agreed to pay psychological treatment bills, which were not covered by insurance, for the plaintiff. (Compl. ¶¶69, 70, 262.) Plaintiff alleges that, in a letter dated April 15, 2003, Archabbot Nowicki informed the plaintiff that, for payments to continue, it would be necessary for defendants to review a clear treatment plan that would include both comprehensive psychiatric and psychological evaluation "to ensure that the recommended treatment plan is well reasoned and has a high probability of being a benefit to him." (Compl. ¶76.) Plaintiff alleged that defen-

---

and secure environment on Benedictine owned and operated property; (Count VI) negligent supervision; (Count VII) persons acting in civil conspiracy; (Count VIII) supplying false information/negligent misrepresentations; (Count IX) failure to protect against foreseeable risk; (Count X) duty to warn of unreasonable risk of harm; (Count XI) negligent supervision or use of improper persons as agents; (Count XII) use of incompetent persons; (Count XIII) fraudulent concealment; (Count XIV) intentional failure to supervise; and (Count XV) intentional failure to warn.

2. These counts include (Count XVI) breach of fiduciary duties in 2002 and 2003; (Count XVII) negligent infliction of emotional distress; and (Count XVIII) punitive damages.

dants began paying counseling bills for his treatment, but then ceased paying, suddenly imposing oppressive conditions upon the plaintiff. (Compl. ¶264.)

Additionally, with respect to this second category of allegations, plaintiff alleges that defendants' offer to pay for his therapy was not to benefit plaintiff but to enable defendants to obtain confidential information about plaintiff not otherwise available to them in the event plaintiff should bring a legal action (Compl. ¶249.) Plaintiff alleges that these acts constituted a conflict of interest and breach of fiduciary duty by defendants. (Compl. ¶249.)

The standard of review of preliminary objections is a limited one. *AM/PM Franchise Association v. Atlantic Richfield Co.*, 526 Pa. 110, 121, 584 A.2d 915, 921 (1991). I must accept as true all material facts set forth in the complaint, as well as all inferences reasonably deducible from those facts. *Sherk v. County of Dauphin,* 531 Pa. 515, 516, 614 A.2d 226, 227 (1992). In order to grant a demurrer, the law must say with certainty that no recovery is possible. *Id.* at 517, 614 A.2d at 227. Furthermore, any doubt that exists as to whether a demurrer should be sustained must be resolved by overruling the objection. *Id.* at 517, 614 A.2d at 227.

## I. CAUSES OF ACTION BASED UPON 1980 AND 1981 ABUSE

### A. *Statute of Limitations*

The defendants have filed preliminary objections based upon the statute of limitations for the causes of action set forth by plaintiff arising from the alleged abuse that occurred in 1980 and 1981. Plaintiff filed a preliminary

objection to the defendants' preliminary objections founded upon the statute of limitations argument, and contends that the affirmative defense of the statute of limitations is limited to being raised by defendants in new matter, whereupon plaintiff could file a reply asserting estoppel and waiver. Plaintiff raised the statute of limitations in his complaint, and asserted facts in an effort to show that the statute of limitations was tolled by operation of the discovery rule and/or through fraud and concealment of the defendants. However, the issue of whether the discovery rule[3] operates to toll the statute of limitations can be asserted one of two ways: (1) by asserting it in a responsive pleading when defendant raises the statute of limitations in new matter; or (2) by "pleading in the complaint sufficient facts to sustain application of the rule . . . ." *Prevish v. Northwest Medical Center—Oil City Campus,* 692 A.2d 192, 197 (Pa. Super. 1997). Since the plaintiff has raised defenses in his complaint to the barring of his claims by the obvious issue of the statute of limitations, this issue may be properly addressed in preliminary objections.

The applicable statute of limitations for plaintiff's causes of action based upon the alleged abuse in 1980 and 1981 is two years. 42 Pa.C.S. §5524. The statute of limitations begins to run as soon as the right to institute and maintain suit arises. *Weik v. Estate of Brown,* 794 A.2d 907, 909 (Pa. Super. 2002) (quoting *Cappelli v. York Operating Co. Inc.,* 711 A.2d 481, 484-85 (Pa. Super.

---

3. Plaintiff also asserts that the statute of limitations was tolled due to fraud and/or concealment on the part of defendants. As will be discussed *infra,* the discovery rule and the concealment doctrine are distinct doctrines, yet both encompass the same inquiry with respect to the requirement that plaintiff proceed with due diligence.

1998)). Lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations. *Dalrymple v. Brown,* 549 Pa. 217, 223, 701 A.2d 164, 167 (1997). It is the duty of the party asserting a cause of action "to use all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed period." *Weik,* 794 A.2d at 909 (quoting *Cappelli, supra*). Aggrieved individuals are required to bring their claims within a certain time of the injury "so that the passage of time does not damage the defendant's ability to adequately defend against claims made." *Dalrymple,* 549 Pa. at 223, 701 A.2d at 167.

The discovery rule is an equitable one, which excludes the period of time during which the injured party is reasonably unaware that injury has been sustained. *Id.* The party seeking to invoke the discovery rule bears the burden of establishing the inability to know of the injury despite the exercise of reasonable diligence. *Id.* Where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible. *Id.* (citing *Hayward v. Medical Center of Beaver County,* 530 Pa. 320, 325, 608 A.2d 1040, 1043 (1992)). The standard of reasonable diligence is an objective or external standard that is the same for all individuals; it is not a subjective standard that is unique to a particular plaintiff. *Id.* at 224, 701 A.2d at 167; *Kingston Coal Co. v. Felton Mining Co.,* 456 Pa. Super. 270, 280, 690 A.2d 284, 289 (1997). It is a standard of reasonable diligence as applied to a "reasonable person." *Dalrymple,* 549 Pa. at 224, 701 A.2d

at 167. When a plaintiff "possesses the salient facts concerning the occurrence of his injury and who or what caused it," the plaintiff has a duty and the ability to investigate further. *White v. Owens-Corning Fiberglas Corp.,* 447 Pa. Super. 5, 21, 668 A.2d 136, 144 (1995).

Plaintiff admits that he knew he suffered an "injury" by Fathers Downey, Campbell and Cherry at the time of the alleged sexual assaults in 1980 and 1981. (Compl. ¶59.) However, plaintiff alleges that he was not aware of the knowledge and involvement of the Diocesan and Benedictine defendants with respect to the predator priests, which aided, enabled, encouraged and resulted in the individual priests causing the injury to the plaintiff, until various public disclosures were made by defendants beginning in March of 2002. (Compl. ¶59.) Essentially, plaintiff's argument is that he was aware that he was injured when he was abused by the priests, but was not aware of the involvement of others, the Diocesan and Benedictine defendants, which plaintiff alleges contributed to the occurrence of the injuries plaintiff sustained.

"Reasonable diligence" is defined as a reasonable effort to discover the cause of an injury under the facts and circumstances presented in the case. *Cochran v. GAF Corp.,* 542 Pa. 210, 217, 666 A.2d 245, 249 (1995). The standard espoused by the courts of this Commonwealth is as follows:

"Long ago we recognized that '[t]here are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. . . .' . . . Under [an objective] standard, the plaintiff's actions must be evaluated to determine whether he exhibited 'those qualities

of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others.' . . . Despite the objective nature of the reasonable diligence standard, '[i]t is sufficiently flexible, however, to take into account difference[s] between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question.' . . . Thus, this case law teaches that a plaintiff is not under an absolute duty to discover the cause of his [injury]. Instead, he must exercise only the level of diligence that a reasonable man would employ under the facts and circumstances presented in a particular case." *Cochran,* 542 Pa. at 217, 666 A.2d at 249 (quoting opinion in support of reversal in *Baumgart v. Keene,* 542 Pa. 194, 207, 666 A.2d 238, 244 (1995)). (citations omitted)

The limitations period begins to run when the injured party "possesses sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate to determine whether he is entitled to redress." *Weik,* 794 A.2d at 909 (quoting *Cappelli,* 711 A.2d at 485).

The standard to be applied is "whether the information, through the exercise of due diligence, was knowable to the plaintiff." *Cappelli,* 711 A.2d at 488. The failure of plaintiff to make inquiry when information is available is the failure of plaintiff to exercise reasonable diligence as a matter of law. *Id.; Kingston Coal Co.,* 456 Pa. Super. at 280, 690 A.2d at 289.

In this case, there are no allegations that plaintiff reported the abuse to anyone or made inquiries of the defendants regarding the abuse that occurred in 1980 and 1981 until 2002. (¶¶43, 63, 65.) Plaintiff failed to make

any inquiry regarding the involvement of defendants until disclosures were made by defendants in the media in 2002. Plaintiff has alleged that he trusted the defendants and believed that defendants were not entities that would tolerate such behavior. Plaintiff would request to be excused from the requirement that he exercise due diligence solely due to the status of defendant organizations' affiliation with the church.

Whether plaintiff was reasonable in his belief that the defendants would not tolerate such conduct, and whether plaintiff exercised due diligence under the facts and circumstances presented in this case, require factual determinations that must be determined by a jury. This is not an issue that is so clear that reasonable minds could not differ such that the commencement of the statute of limitations can be determined as a matter of law.

Likewise, plaintiff alleges that defendants participated in fraud or concealment such that defendants should be estopped from asserting the defense of the statute of limitations. The complaint contains a series of allegations regarding fraudulent misrepresentations and/or concealment by defendants, *i.e.,* that the Diocesan defendants engaged in a covert policy and practice to conceal the problem of sexual abuse of children by parish clergy. (Compl. ¶111.) Plaintiff pleads fraudulent concealment of essential facts under the Diocesan defendants' control, giving rise to plaintiff's causes of action against the Diocesan defendants, which facts were not knowable to the plaintiff. (Compl. ¶¶126, 224.) Plaintiff alleges that defendants participated in the systematic suppression and distortion of facts concerning the defendants' knowledge and notice of the problem of sexually abusive priests in the Diocese, including Benedictine priests that were as-

signed to the Diocese, and that the defendants' efforts to cover up, suppress and distort what they knew effectively concealed the existence of their own negligent behavior from the plaintiff. (Compl. ¶¶222-23.) Plaintiff asserts that defendants, by use of fraudulent concealment, duress and coercion prior to, during and after the termination of the sexual abuse of the plaintiff, prevented him from asserting his claims against the defendants. (Compl. ¶129.) Plaintiff alleges that he believed that neither the Diocesan defendants nor the Benedictine defendants would tolerate criminal misconduct that presented a known threat to children by a priest. (Compl. ¶155.)

If, through fraud or concealment, defendant caused plaintiff to relax his vigilance or deviate from his right of inquiry, defendant is estopped from invoking the bar of the statute of limitations. *Lange v. Burd,* 800 A.2d 336 (Pa. Super. 2002). Plaintiff need not prove that defendants' conduct rose to the level of fraud in the strictest sense (intent to deceive). *Burton-Lister v. Siegel, Sivitz and Lebed Associates,* 798 A.2d 231, 237 (Pa. Super. 2002). Unintentional fraud or concealment is sufficient. *Id.* Mere mistake, misunderstanding or lack of knowledge, however, is insufficient to estop defendants from invoking the statute of limitations defense. *Id.* Plaintiff has the burden of proving fraud or concealment by evidence that is clear, precise and convincing. *Kingston Coal Co.,* 456 Pa. Super. at 283-84, 690 A2d at 290-91. The defendants must have committed some affirmative independent act of concealment upon which the plaintiff justifiably relied. *Id.* at 284, 690 A.2d at 291.

Fraudulent concealment, however, will not toll the running of the statute of limitations where the plaintiff has not exercised reasonable diligence. *Forbes v.*

*Eagleson,* 19 F. Supp.2d 352 (E.D. Pa. 1998) ("a plaintiff who is not reasonably diligent in attempting to discover his or her claims will not enjoy the tolling of the limitations period simply because the defendant engaged in fraudulent concealment"). As discussed *supra,* the issue of whether plaintiff was reasonable in his belief that the defendants would not tolerate such conduct presents a factual question that cannot be decided as a matter of law. Therefore, the defendants' preliminary objections based upon the statute of limitations will be overruled.

## Statutory Violation/Negligence Per Se

Defendants have filed preliminary objections to Count I of plaintiff's complaint, which is based upon the failure of defendants to report suspected child abuse pursuant to the Pennsylvania Child Protective Services Law (PCPSL), citing 11 P.S. §2201 (repealed), and 23 Pa.C.S. §6301 et seq. At the time of the alleged abuse in 1980 and 1981, the PCPSL did not specifically enumerate the clergy as a category of those required to report abuse. The clergy was specifically enumerated under the statute as reporters of abuse in 1995. Plaintiff has not cited any case law from Pennsylvania that has held that the PCPSL has been retroactively applied to include the clergy as reporters of abuse at the time of the 1980 and 1981 abuse. This issue was addressed by the Honorable Alan M. Black of the Court of Common Pleas of Lehigh County, in *A.L.M. v. Diocese of Allentown,* no. 2004-C-592, and I find his reasoning persuasive. In finding that the amendment to the PCPSL does not apply retroactively, Judge Black relied upon the presumption that "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1

Pa.C.S. §1926. The Pennsylvania Supreme Court in *Commonwealth v. Scoleri,* 399 Pa. 110, 132-33, 160 A.2d 215, 226-27 (1960), held:

"Whenever a section or part of a law is amended, the amendment shall be construed as merging into the original law, become a part thereof, and replace the part amended and the remainder of the original law and the amendment shall be read together and viewed as one law passed at one time; but the portions of the law which were not altered by the amendment shall be construed as effective from the time of their original enactment, *and the new provisions shall be construed as effective only from the date when the amendment became effective.*" *Id.* (emphasis in original)

As Judge Black noted, there is no indication in the amendment to the PCPSL that the General Assembly intended it to be applied retroactively. Accordingly, Count I of plaintiff's complaint for statutory violation/negligence per se will be dismissed.

## B. *Subject Matter Jurisdiction*

Defendants argue that plaintiff's causes of action are based solely on the administration and organization of the church and involve purely ecclesiastical affairs, over which the court lacks subject matter jurisdiction pursuant to the First and Fourteenth Amendments to the United States Constitution, which protect the free exercise of religion and guard against excessive entanglement of the state in matters of the church. Courts may not inquire into ecclesiastical questions, *i.e.,* where the resolution of an issue involves questions of discipline, faith, ecclesiastical rule, custom or law. *Presbytery of Beaver-Butler*

*v. Middlesex Presbyterian Church,* 507 Pa. 255, 260, 489 A.2d 1317, 1319-20 (1985) (citing *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952)).

Not all disputes involving religious institutions, however, are doctrinal disputes. *Orthodox Church of America v. Pavuk,* 114 Pa. Commw. 176, 181, 538 A.2d 632, 634 (1988). If the dispute involves principles of civil law that may be resolved upon the consideration of neutral principles without intruding into the sacred precincts of the church, then the approach is completely secular in operation and is not predicated on any religious doctrine. *Presbytery of Beaver-Butler,* 507 Pa. at 263, 489 A.2d at 1321. Here, plaintiff's causes of action stem from conduct that is a state concern. A resolution of these tort claims does not involve the interpretation of doctrinal or theological matters. Where the resolution of the dispute does not involve inquiry into an ecclesiastical question, I am to apply the same principles of law as would be applied to non-religious associations. *Gaston v. Diocese of Allentown,* 712 A.2d 757, 760 (Pa. Super. 1998). Therefore, this preliminary objection of the defendants will be overruled.

## II. CAUSES OF ACTION BASED UPON 2002 AND 2003 CONDUCT

### A. *Breach of Fiduciary Duties in 2002 and 2003*

In Count XVI of the complaint, plaintiff alleges that defendants had a fiduciary duty to plaintiff, holding themselves out as trustworthy religious authorities. (Compl.

¶244.) With respect to the defendants' undertaking to pay uninsured therapy bills of plaintiff, plaintiff alleges that defendants breached their fiduciary obligation to him by failing to make full disclosure to plaintiff, at the time they proposed payment of his bills, of any conflicts of interest or their intent to use confidential information that defendants obtained about plaintiff to refuse to pay plaintiff's medical bills as promised. (Compl. ¶248.) Plaintiff alleges that the purpose for offering to pay for plaintiff's psychotherapy was not to benefit plaintiff, but to enable defendants to obtain confidential information about plaintiff that would not otherwise be available to defendants in the event plaintiff should bring a legal action against defendants. (Compl. ¶249.) Plaintiff also alleges that by paying for psychotherapy for plaintiff, defendants hoped to preclude plaintiff from filing any actions, although at no time did defendants state this intention, which constituted a breach of fiduciary duty and a conflict of interest. (Comp. ¶250.) Plaintiff alleges that defendants used the confidential relations they had established with plaintiff to cause plaintiff to believe that defendants were looking out for plaintiff's best interest, engaging in kindly and charitable endeavors, when defendants were not. (Compl. ¶251.) Plaintiff alleges that the breach of fiduciary duties by defendants caused him harm and damage as follows: (1) revictimizing plaintiff and causing an additional loss of trust; (2) causing him upset and distress in that he relied on representations made by defendants; (3) interfering with his planned treatment based on representations made by defendants; (4) interfering with a relationship with plaintiff's doctors; (5) forcing plaintiff to disclose private information to try to obtain promised treatment, none of which was previously

disclosed; and (6) causing additional emotional distress and aggravating a pre-existing condition. (Compl. ¶253.)

A review of plaintiff's allegations in the "Factual history" section of the complaint, which is incorporated into the breach of fiduciary duty cause of action, is as follows. Plaintiff learned of the involvement of defendants with respect to the alleged cover-up of predator priests in March of 2002. (Compl. ¶¶59-60.) On July 8, 2002, plaintiff was admitted to a psychiatric hospital with suicidal thoughts, depression, anxiety, alcoholism and suffering from post-traumatic stress disorder. (Compl. ¶64.)

On July 2, 2002, plaintiff, along with his mother and a local physician who came in support of plaintiff, met with defendants, Bishop Adamec and Archabbot Nowicki. (Compl. ¶65.) At the meeting, defendants promised to pay for plaintiff's psychotherapy that was not covered by health insurance, the only stated condition for payment. (Compl. ¶67.) Plaintiff relied on these representations that he would be able to pursue medical treatment as needed to recover or ameliorate the long-time effects of the sexual abuse, and began or continued treatment with the understanding that the defendant would "unconditionally pay for uninsured counseling treatment and a psychiatric evaluation." (Compl. ¶69.) The defendants paid some of the submitted bills for therapy that were not covered by insurance. (Compl. ¶70.) Plaintiff alleges that at some point he was unable to work and lost his health insurance. (Compl. ¶71.)

On February 6, 2003, plaintiff was referred by a counselor to see a highly trained and well-respected psychologist for specialized therapy, which he believed would be paid by defendants. (Compl. ¶72.) On February 18, 2003, counsel for defendants contacted the new psychologist

and told him that his undisclosed client would only pay for the first $110 session unless the psychologist wrote a letter to the attorney indicating what additional treatments were needed and the approximate charge of each. (Compl. ¶73.) With plaintiff's permission, the psychologist wrote a brief report indicating that his initial evaluation disclosed that plaintiff suffered from post-traumatic stress disorder, alcohol addiction and depression, which would require years of psychotherapy, and that the psychologist would await a reply before beginning further treatment (Compl. ¶74.) On April 11, 2003, counsel for defendants informed the psychologist that he should not schedule any additional treatments until futher notice from the attorney, who had paid for the one session with the psychologist. (Compl. ¶75.)

On April 15, 2003, Archabbot Nowicki informed plaintiff in a letter that in order for the defendants to continue payments, he would have to review a clear treatment plan that would include both comprehensive psychiatric and psychological evaluation "to ensure that the recommended treatment plan is well reasoned and has a high probability of being of benefit" to plaintiff. (Compl. ¶76.) Archabbot Nowicki also requested that plaintiff undergo a psychiatric exam and psychological testing in Pittsburgh, although plaintiff resided in State College and had no drivers' license. (Compl. ¶77.)

Thereafter, defendants did not pay for further treatment, which made plaintiff feel victimized again since, in order to get the promised treatment, he was now required to travel to Pittsburgh and then have his treatment reviewed by those who had allowed him to be harmed, none of which was disclosed to plaintiff when the promises were made. (Compl. ¶78.) Plaintiff alleges

that Archabbot Nowicki called plaintiff's mother in May of 2003, and disclosed that the real basis of the exam was to have someone from "here" separate the depression from the alcohol problem. Plaintiff avers that the defendants exercised their position of superiority and purported authority over plaintiff. (Compl. ¶84.)

In the allegations incorporated into Count XVI for breach of fiduciary duties in 2002 and 2003, plaintiff avers that when he reported the 1980 and 1981 abuse by Father Downey to the defendants at the meeting of July 22, 2002, plaintiff learned that Father Downey was engaged in counseling children and adolescents. (Compl. ¶66.) Plaintiff alleges that defendants represented to plaintiff that Father Downey would be removed from any opportunity to harm children and their families. (Compl. ¶67.) Plaintiff believed that his disclosures of the abuse to defendants might help prevent other minors from suffering sexual abuse and misconduct by the same priests. (Compl. ¶68.) Plaintiff avers that, despite the defendants' representations to plaintiff that Father Downey was no longer in contact with children and was performing accounting duties, Father Downey continued to interact with vulnerable persons, even as to interviewing and reporting on family members where there were accusations of sexual abuse of children. (Compl. ¶80.)

Defendants have filed preliminary objections to Count XVI on the grounds that there was no legal or fiduciary obligation on the part of defendants to pay for any counseling of plaintiff, and that a fiduciary duty did not arise because of the defendants' willingness to pay for counseling of the plaintiff. Furthermore, defendants assert that

plaintiffs have not alleged a breach of any duty that may have been owed to the plaintiff.

A fiduciary relationship can arise when confidence is reposed by one in the integrity of another, and if the latter voluntarily accepts or assumes to accept the confidence, they cannot act so as to take advantage of the other's interests without such person's knowledge or consent. *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 254 n.3, 602 A.2d 1277, 1283 n.3 (1992). The significant factor is not the mere existence of a relationship between the plaintiff and defendants, but rather the existence of a duty flowing from that relationship. *Hunger v. Grand Central Sanitation,* 447 Pa. Super. 575, 595, 670 A.2d 173, 186 (1996) (Beck, J., concurring).

I will first address the allegations surrounding defendants' representations to plaintiff, upon his reporting of past abuse by Father Downey, that Father Downey would be denied the opportunity of coming into contact with children. As to these allegations, I find such conduct could result in the creation of a fiduciary duty to plaintiff and corresponding breach because the fact-finder could draw an inference that this was a misrepresentation intended to placate the plaintiff in order to gain his trust and thereby lessen the likelihood of the plaintiff pursuing claims against the defendants, in breach of a duty of candor owed by the defendants to the plaintiff. Therefore, as to these allegations, I find that plaintiff has sufficiently pled a cause of action for breach of fiduciary duty.

With respect to plaintiff's remaining allegations of conduct by defendants regarding the alleged unconditional promise to pay uninsured therapy bills of plaintiff and then their cessation of payments, I find that I cannot

determine, with certainty, that plaintiff has not stated a claim for breach of fiduciary duty. For purposes of deciding these preliminary objections, I must accept plaintiff's averment that the only stated condition for payment was that the therapy had to be uninsured. On the face of the complaint, plaintiff has averred an unconditional promise to pay uninsured therapy bills of plaintiff.

Plaintiff has also averred that he began treatment in reliance upon the unconditional promise to pay. (Compl. ¶69.) Plaintiff has averred that conditions were then imposed on the undertaking that were not disclosed to plaintiff at the time of the offer of payment. Accepting these averments as true, which I must do, I cannot conclude that plaintiff has not pled a cause of action for breach of fiduciary duty.

The above allegations, taken as true, also support a claim based upon promissory estoppel. The doctrine of promissory estoppel is invoked when there is no enforceable agreement between the parties because the agreement is not supported by consideration. *Crouse v. Cyclops Industries,* 560 Pa. 394, 745 A.2d 606 (2000). Promissory estoppel is applied to avoid injustice by making enforceable a promise made by one party to another, when the promisee relies on the promise, and therefore changes his position to his own detriment. *Id.* In order to properly plead promissory estoppel, plaintiff's allegations must show that (1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) that injustice

can be avoided only by enforcing the promise. *Id.* Viewing the allegations in the light most favorable to the plaintiff, he has averred that the only stated condition for payment was that the therapy bills were not covered by insurance, plaintiff began treatment in reliance upon the otherwise unconditional promise to pay, and then plaintiff was not able to continue with treatment because defendants failed to continue to make payments. Based upon the standard of review that must be employed with respect to preliminary objections, defendants' preliminary objections to Count XVI must be overruled.

## B. *Negligent Infliction of Emotional Distress*

Defendants have filed preliminary objections to Count XVII of plaintiff's complaint, which seeks damages for negligent infliction of emotional distress. This cause of action is based upon the allegations regarding breach of fiduciary duties by defendants in 2002 and 2003. Plaintiff alleges that the conduct of defendants caused him to suffer emotional injuries, as well as aggravating his physical conditions including post-traumatic stress disorder, sleeplessness and nightmares. (Compl. ¶271.)

Recovery for negligent infliction of emotional distress has been permitted where a defendant owes plaintiff a pre-existing duty of care, either through contract or a fiduciary duty, and breach of that duty causes the emotional distress alleged. *Armstrong v. Paoli Memorial Hospital,* 430 Pa. Super. 36, 50-53, 633 A.2d 605, 612-15 (1993). Although recovery in the above circumstances is recognized, a new and independent cause of action for negligent infliction of emotional distress is not created. *Hunger,* 447 Pa. Super. at 595, 670 A.2d at 183 (Beck,

J., concurring). Therefore, Count XVII of plaintiff's complaint for negligent infliction of emotional distress will be dismissed. However, plaintiff will be permitted to seek recovery for such damages stemming from his claim for breach of fiduciary duties in Count XVI.

Defendants would argue that, even as part of the fiduciary duty claim, plaintiff has not sufficiently alleged physical harm to support recovery for negligent infliction of emotional distress. Physical injury must be alleged to sustain a cause of action for emotional distress. *Armstrong,* 430 Pa. Super. at 44, 633 A.2d at 609. The requirement of physical harm is based on section 436A of the Restatement (Second) of Torts. *Id.* Temporary fright, nervous shock, nausea, grief, rage and humiliation, if transitory, are not compensable harm. *Id.* However, long-continued nausea or headaches, repeated hysterical attacks or mental aberration are compensable injuries. *Id.* Depression, nightmares, nervousness, insomnia and hysteria have been cited as physical symptoms warranting recovery. *Id.* Plaintiff's allegations of aggravation of physical conditions, including post-traumatic stress disorder, sleeplessness and nightmares, are sufficient to aver physical harm for recovery of emotional distress.

## ORDER

And now, October 20, 2004, upon consideration of the preliminary objections filed by the plaintiff and the defendants, the preliminary objections are sustained in part and overruled in part, as follows:

(1) Plaintiff's preliminary objection to the defendants' preliminary objection based upon the statute of limitations is overruled.

(2) Defendants' preliminary objections to Counts I and XVII of plaintiff's complaint, for statutory violation/negligence per se and negligent infliction of emotional distress, respectively, are sustained. Counts I and XVII of plaintiff's complaint are dismissed.

(3) Defendants' preliminary objections pertaining to the statute of limitations, subject matter jurisdiction and breach of fiduciary duties in 2002 and 2003 are overruled.