## A10A1375. THE RECTOR, WARDENS AND VESTRYMEN OF CHRIST CHURCH IN SAVANNAH v. BISHOP OF THE EPISCOPAL DIOCESE OF GEORGIA, INC. et al.
### (699 SE2d 45)

JOHNSON, Judge.

This appeal involves a dispute over church property between the National Episcopal Church[1] and Rector, Wardens and Vestrymen of Christ Church in Savannah (hereinafter "Christ Church"), a parish of the National Episcopal Church that has sought to disaffiliate and that has retained control of church property.[2] At issue is whether the church property is impressed with a trust in favor of the National Episcopal Church. Both parties filed motions for summary judgment. The trial court granted the National Episcopal Church's motion for summary judgment and denied Christ Church's motion for summary

---

[11] See *Brown v. State*, 251 Ga. 598, 600 (3) (308 SE2d 182) (1983).

[1] The named plaintiffs include the Bishop of the Episcopal Diocese of Georgia, Inc., the Episcopal Church, and local plaintiffs (Christ Church Episcopal and the Rector, Wardens and Vestry of Christ Church Episcopal), hereinafter "the National Episcopal Church."

[2] Title is in dispute as to four parcels of real estate that are commonly known as follows: a church building at 28 Bull Street, Savannah, conveyed to the parish's predecessor, "Christ-Church," by Act of the government in 1758; a church parish house at 18 Abercorn Street in Savannah, conveyed to the "Rector, Church Wardens and Vestrymen of Christ Church in Savannah" in 1940; two lots on the southwest corner of Congress and Drayton Streets in Savannah used for parking, conveyed to the "Rector, Church Wardens and Vestrymen of Christ Church in Savannah" in 1994; and one and one-half lots at 134 Houston Street in Savannah used for a school, conveyed to the "Rector, Church Wardens and Vestrymen of Christ Church in Savannah" in 1947 and 1958.

judgment, finding that even though the parish owns its real estate, the discipline, canons, and constitutions of the National Episcopal Church and the Diocese of Georgia established an implied and express trust over the property for the use of the National Episcopal Church. We find no error and affirm the trial court's order. In fact, Superior Court Judge Michael Karpf, in his 21-page order, thoroughly and correctly detailed the history of Christ Church and the National Episcopal Church, and he properly analyzed the relevant statutes and church documents. We have incorporated much of his order in our opinion.

It is well settled that civil courts cannot intervene in doctrinal disputes within a church.[3] However, where a church property dispute can be resolved without regard to the doctrinal disputes, a court is authorized to render a decision that enforces the legal rights of the parties.[4] Georgia law recognizes two basic types of church government: congregational and hierarchical.[5] A congregational church is strictly independent of other ecclesiastic associations and owes no fealty or obligation to any higher church government authority.[6] If the church government is congregational, then a majority of its members control its decision and local church property.[7] A hierarchical church, on the other hand, is "organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head."[8] If a church is hierarchical, then we must use "neutral principles of law" to determine whether the local church or parent church has the right to control local property.[9] Neutral principles of law include state statutes, corporate charters, relevant deeds, and the organizational constitutions and bylaws of the denomination.[10]

Here, careful consideration of the National Episcopal Church's structure and history persuades us that the National Episcopal Church is hierarchical. The church organization has three tiers: (1) the National Episcopal Church, (2) geographically-defined dioceses that belong to, are subordinate to, and are under the jurisdiction of the National Episcopal Church, and (3) local parishes that belong to,

---

[3] U. S. Const. Amend. I; see *First Evangelical Methodist Church of LaFayette v. Clinton*, 257 Ga. 459 (360 SE2d 584) (1987).

[4] *Carnes v. Smith*, 236 Ga. 30, 35 (1) (222 SE2d 322) (1976).

[5] *Pritchett v. Wesleyan Pentecostal Church at Holly Springs*, 265 Ga. App. 565, 567 (2) (594 SE2d 750) (2004).

[6] Id.

[7] *Crumbley v. Solomon*, 243 Ga. 343 (254 SE2d 330) (1979).

[8] (Citations and punctuation omitted.) *Pritchett*, 265 Ga. App. at 567.

[9] *Crumbley*, 243 Ga. at 343.

[10] Id.; see also *Pritchett*, 265 Ga. App. at 567.

are subordinate to, and are under the jurisdiction of the National Episcopal Church and the individual diocese in which the parish is located. At the present time, the National Episcopal Church is comprised of 111 dioceses and thousands of individual churches, each of which must be affiliated with a diocese. The National Episcopal Church is governed by a general convention composed of bishops and deputies. The dioceses are governed by bishops and an annual convention. Each parish is governed by a vestry, which is akin to a board of directors. The vestry of each church sends delegates to its diocesan convention, and each diocese sends delegates to the general convention. There are governing documents at each level of the church. The National Episcopal Church has a constitution and canons, which are similar to bylaws. The dioceses also have constitutions and canons, but these are subordinate to the governing documents of the National Episcopal Church. The individual parishes are controlled by the terms of their charters and bylaws, which are in turn subordinate to the constitutions and canons of both the diocese and the National Episcopal Church. In addition, the dioceses and parishes are subject to the doctrine, discipline, and worship of the National Episcopal Church generally.

Having concluded that the National Episcopal Church is hierarchical, we must apply the neutral principles of law, referring to (1) the land grant to Christ Church, (2) state statutes, and (3) governing church documents of Christ Church, the Diocese of Georgia, and the National Episcopal Church to determine whether the National Episcopal Church or Christ Church controls the local property. A thorough review of these records and documents leads us to conclude that the trial court correctly found that the National Episcopal Church is entitled to control the local property despite the fact that Christ Church owns the property.

1. *Land Grant.* The record shows that the land on which Christ Church sits was designated as a place of worship in 1733 when the colony of Georgia was founded. Title to the property was later vested in Christ Church by act of the provincial legislature in 1758. The provincial legislature confirmed the grant of land to Christ Church in Savannah by naming the rector and giving him and his successors the possession and title to the church and church lands. This legislative land grant was again confirmed by the General Assembly of Georgia in 1789, establishing title to the church property in the wardens and vestrymen of Christ Church and establishing the church as a body corporate with the power to sue and be sued. We agree with Christ Church that this land grant does not establish the trust relied on by the National Episcopal Church since Christ Church took title to the property prior to the existence of the Diocese

of Georgia and before the National Episcopal Church had any presence in Georgia.[11]

2. *State Statutes*. In support of its position that a trust exists, the National Episcopal Church relies on OCGA § 14-5-46, part of the Georgia Nonprofit Corporation Code originally enacted in 1805, which now provides:

> All deeds of conveyance executed before April 1, 1969, or thereafter for any lots of land within this state to any person or persons, to any church or religious society, or to trustees for the use of any church or religious society for the purpose of erecting churches or meeting houses shall be deemed to be valid and available in law for the intents, uses, and purposes contained in the deeds of conveyance. *All lots of land so conveyed shall be fully and absolutely vested in such church or religious society or in their respective trustees for the uses and purposes expressed in the deed to be held by them or their trustees for their use by succession, according to the mode of church government or rules of discipline exercised by such churches or religious societies.*[12]

Further, OCGA § 14-5-47 provides:

> All trustees to whom conveyances are or shall be executed, for the purposes expressed in Code Section 14-5-46, shall be subject to the authority of the church or religious society for which they hold the same in trust and may be expelled from said trust by such church or society, according to the form of government or rules of discipline by which they may be governed.

Christ Church presents numerous arguments opposing the application of these Code sections to the real property at issue. These arguments include the fact that Christ Church received title to its property by grant from the legislature, not by deed; that the section does not apply to Christ Church because its title had already been confirmed by act of the legislature; that Christ Church was an

---

[11] This is similar to the case of *Episcopal Diocese of Rochester v. Harnish*, 899 NE2d 920 (N.Y. 2008). In *Harnish*, the court reviewed real property deeds and found that there was "nothing in the deeds that establishe[d] an express trust in favor of the Rochester Diocese or National Church." Id. at 924. Nevertheless, the *Harnish* court then reviewed the constitution of the National Episcopal Church concerning the ownership and control of church property, and concluded that the diocese and National Episcopal Church canons clearly established an express trust in favor of the diocese and the National Episcopal Church. Id. at 925.

[12] (Emphasis supplied.)

incorporated body capable of taking good title prior to the enactment of the Code section; and that the purpose of the section was in aid of other religious bodies, but not Christ Church. These arguments lack merit.

First, OCGA § 14-5-11 provides that the Georgia Nonprofit Corporation Code applies to all corporations chartered by the General Assembly. OCGA § 14-5-40 provides that the Georgia Nonprofit Corporation Code is "fully applicable to all nonprofit corporations organized for religious ... purposes, including incorporated churches." The broad application of the nonprofit corporation codes to religious corporations demonstrates the General Assembly's clear intent to apply corporate law to all religious corporations in the state. The General Assembly could not and did not create "classes" of church corporations based upon the manner in which they were incorporated or the method of conveyance of property to the church.[13] Thus, contrary to its argument, Christ Church and the property in dispute are subject to the same provisions, conditions, and limitations as any other incorporated church and its property.

Moreover, at the time Christ Church was incorporated and the legislature confirmed its land grant, it was a congregational church, unaffiliated with either the Diocese of Georgia (which had not yet been formed) or the National Episcopal Church. However, when Christ Church joined the Diocese of Georgia and the National Episcopal Church hierarchy in 1823, the two Code sections had been promulgated 18 years earlier. By taking the steps to affiliate itself with the National Episcopal Church, Christ Church made itself subject to the Code sections. Even though the first part of OCGA § 14-5-46 did not change the status of the church's title to its property, which was already valid by the earlier act of the legislature, the second sentence became applicable. This is so because, as will be seen later, "the mode of church government [and] rules of discipline"[14] of the National Episcopal Church established a trust.

Christ Church argues that the statutory language "deeds of conveyance" in OCGA § 14-5-46 exclude the property at issue because it was conveyed by legislative act and not by any deed. We disagree. First, "deed of conveyance" is not a term of art defined in the applicable Code section or chapter. Second, Black's Law Dictionary defines "deed" as "an act or action," "[a] written instrument by which land is conveyed," or "any written instrument that is signed, sealed, and delivered and that conveys some interest in

---

[13] See *Larson v. Valente*, 456 U. S. 228, 244-246 (III) (A) (102 SC 1673, 72 LE2d 33) (1982) (striking down statute that applied only to certain religious organizations and declaring that one religious denomination cannot be officially preferred over another).

[14] See OCGA § 14-5-46.

YALE LAW LIBRARY

property."[15] The word "deed" may mean "any formal conveyance for the transfer of land or of an interest therein."[16] There is no indication that a legislative act conveying property would not meet the definition of a deed contained in OCGA § 14-5-46. In fact, to suggest that churches that obtained title to land directly from the state are beyond the law, while those that obtained title through an intermediate owner are within the law, is absurd. The trial court correctly found that OCGA §§ 14-5-46 and 14-5-47 support the existence of a trust over Christ Church property.

3. *Governing Church Documents.*

(a) *Implied Trust*: The original charter of Christ Church and the subsequent amendments thereto did not create an express trust over the church's property in favor of the National Episcopal Church. However, the record shows that these documents did create an implied trust over the church's property in favor of the National Episcopal Church. The Diocese of Georgia was formed and admitted into the National Episcopal Church in 1823. And Christ Church not only became a parish of the Diocese of Georgia in 1823, but it was instrumental in the formation of the diocese. New dioceses promise "unqualified accession" to the National Episcopal Church's constitution, canons, and discipline. Dioceses, in turn, require parishes to "accede" to the constitution, canons, and discipline of the National Episcopal Church and the diocese. Specifically, the canons of the Diocese of Georgia require congregations seeking parish status to adopt Articles of Association stating:

> This Parish acknowledges, accedes to, and adopts, and shall adhere to the doctrine, discipline, worship, and usages of the Episcopal Church, acknowledges the authority of the General Convention thereof and the Constitution and Canons set forth and from time to time amended by said General Convention, likewise the authority of the Bishop of Georgia, the Convention of the Diocese of Georgia, and the Constitution and Canons of the Diocese of Georgia as set forth and from time to time amended by said Diocesan Convention.

As a result of joining the Diocese of Georgia, Christ Church became subject to the "usual disciplines" of the National Episcopal Church and the constitutions, canons, and discipline of both the Diocese of Georgia and the National Episcopal Church.

---

[15] Black's Law Dictionary 475 (9th ed. 2009).
[16] Id.

When Christ Church amended its charter in 1918, it confirmed its accession to the Diocese of Georgia and the National Episcopal Church: "This church does hereby acknowledge and accede to the doctrine, discipline, and worship and the Constitution and Canons of the [National] Episcopal Church in the United States of America, and the Constitution and Canons of the same church in the Diocese of Georgia." The same amendment provided that Christ Church "shall have power to adopt rules or by-laws not inconsistent with the civil and ecclesiastical laws governing it." Christ Church recorded the same charter again with the Secretary of State of Georgia in 1981.

There can be no doubt that Christ Church held itself out as a parish of the Diocese of Georgia and a full participant in the affairs of the National Episcopal Church at every level from 1823 until at least 2006. In fact, Christ Church has had near perfect attendance at diocesan conventions, and its clergy and laity regularly filled leadership roles in the diocese and promoted promulgation of diocese canons requiring accession to the rules of the National Episcopal Church and the Diocese of Georgia and governing use of parish property. Christ Church has benefitted from its connection to the National Episcopal Church in a myriad of ways, including using the National Episcopal Church prayer book, electing clergy educated and trained under the National Episcopal Church's governance, and participating in the National Episcopal Church's pension program.

The record is replete with uncontradicted evidence that the National Episcopal Church's policy and practice, included in canonical provisions of 1789, 1868, 1871, 1904, 1916, and 1940, has always required parish property to be held and used for the mission of the National Episcopal Church and its dioceses. Indeed, courts from around the country have expressly found that an implied trust has always existed in the National Episcopal Church.[17] We find that Christ Church acceded to the National Episcopal Church's implied trust, which had become a part of the fabric of governance of the National Episcopal Church, through its actions of (a) becoming a parish in the Diocese of Georgia in 1823, thereby accepting admission in the National Episcopal Church and agreeing to be bound by the constitutions, canons, and doctrine of the Diocese of Georgia and

---

[17] See, e.g., *Episcopal Church Cases*, 198 P3d 66, 80-81 (II) (B) (2) (Cal. 2009) (trust relationship "had long been implicit"); *Trustees of the Diocese of Albany v. Trinity Episcopal Church of Gloversville*, 250 AD2d 282, 288 (N.Y. App. 1999) (trust relationship has implicitly existed between the local parishes and their dioceses throughout the history of the National Episcopal Church); *The Rector, Wardens and Vestrymen of Trinity-St. Michael's Parish v. The Episcopal Church in the Diocese of Connecticut*, 620 A2d 1280, 1292-1293 (III) (Conn. 1993) (trust relationship has been implicit in the relationship between local parishes and dioceses since the founding of the Episcopal Church in 1789).

the National Episcopal Church, and (b) amending its charter in 1918 to affirm its adherence to the National Episcopal Church doctrine.

While Christ Church suggests that *Presbyterian Church &c. v. Eastern Heights Presbyterian Church*[18] prohibits the finding of an implied trust under Georgia law, this argument misconstrues the holding of *Eastern Heights Presbyterian Church*. First, that case was decided prior to *Jones v. Wolf*,[19] which distinguished and explained it. Second, the Supreme Court of Georgia noted in *Eastern Heights Presbyterian Church* that a trust may not be implied from the mere connection of a local church to a hierarchical church.[20] The Supreme Court says nothing about the propriety of finding an implied trust where, as here, the hierarchical church has adopted numerous rules codifying the trust relationship, and the local church has adopted and adhered to those rules.[21]

Moreover, the Supreme Court of Georgia has recognized the existence of an implied trust over property in a similar case:

> A local church, if it desires to remain independent of the influence of a parent church body, must maintain this independence in the important aspects of its operation — e.g., polity, name, finances. It cannot, as here, enter a binding relationship with a parent church which has provisions of implied trust in its constitution, by-laws, rules, and other documents pertaining to the control of property, yet deny the existence of such relationship. It does not matter whether such agreement to be bound is memorialized. A local church cannot prosper by the benefits afforded by the parent, participate in the functioning of that body, yet successfully disclaim affiliation when the parent acts to the apparent disadvantage of the local, so to shield from equitable or contractual obligation the valuable property acquired by the local church either before or during such affiliation.[22]

The trial court properly found that an implied trust over Christ Church property existed in favor of the National Episcopal Church.

---

[18] 225 Ga. 259 (167 SE2d 658) (1969).

[19] 443 U. S. 595 (99 SC 3020, 61 LE2d 775) (1979). This is the landmark case on the involvement of courts in resolving disputes within churches. The Supreme Court noted that hierarchical churches could establish a trust over local church property by amending their governing documents.

[20] *Eastern Heights Presbyterian Church*, 225 Ga. at 260.

[21] See *Carnes*, 236 Ga. at 34-35 (1).

[22] (Citation and punctuation omitted.) Id. at 39 (1).

(b) *Express Trust*: Not only did Christ Church accede to the National Episcopal Church's implied trust, but it also acceded to the National Episcopal Church's express trust. On July 2, 1979, the United States Supreme Court stated:

> At any time before [a] dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternatively, the constitution of the general church can be made to recite an express trust in [its] favor. . . . The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.[23]

Shortly thereafter, the National Episcopal Church's implied trust principle was formalized and converted into an express trust with the adoption of the Trust Canon of 1979 by the General Convention of the National Episcopal Church. This canon is sometimes referred to as the "Dennis Canon" and expressly states that all parish real and personal property is held in trust for the National Episcopal Church and its dioceses:

> Sec. 4. All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its Constitution and Canons.
> Sec. 5. The several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4 by appropriate action, but no such action shall be necessary for the existence and validity of the trust.

The National Episcopal Church enacted the Dennis Canon in response to the United States Supreme Court decision in *Jones v. Wolf* so as to make clear the National Episcopal Church's implied inten-

---

[23] *Jones*, 443 U. S. at 606 (III).

tion to hold a trust interest in parish property. And courts across the country have recognized that the Dennis Canon effectuates an express trust regarding parish property.[24]

Likewise, the Supreme Court of Georgia has found trust provisions in a hierarchical church's governing documents to be dispositive evidence of a trust. For example, in *Crumbley*, a case involving a dispute over property of a local church affiliated with a hierarchical church, the Court found a trust for the benefit of the general church based upon the hierarchical church's governing documents, which provided that it "shall hold all church property, regardless if all members vote to change the church to some other faith."[25] In addition, the Supreme Court has found conclusive evidence of a trust from a hierarchical church's Book of Discipline.[26]

Christ Church's action of re-recording its 1918 charter amendment in the office of the Secretary of State of Georgia in 1981 can only be seen as a ratification and reaffirmation of Christ Church's accession to the doctrine, discipline, worship, constitution and canons of the National Episcopal Church and the Georgia Diocese as of 1981, after the enactment of the Dennis Canon.[27] We note that Christ Church failed to take any steps to disavow the canon or attempted to remove itself from the reach of the Dennis Canon in the more than 30 years since the National Episcopal Church adopted the express trust provision. In addition, Christ Church has repeatedly sought the canonically-required consent of the Diocese of Georgia before alienating real property or incurring indebtedness, including two times after adoption of the Dennis Canon in 1979.[28] These actions compel the conclusion that Christ Church intended to, and did, hold its

---

[24] See, e.g., *Episcopal Church Cases*, 198 P3d at 80-81; *Harnish*, 899 NE2d at 925 (the Dennis Canon clearly establishes an express trust in favor of the National Episcopal Church); *In re: Church of St. James the Less*, 888 A2d 795, 810 (Pa. 2005) (the Dennis Canon codifies a trust relationship in explicit terms); *The Rector, Wardens and Vestrymen of Trinity-St. Michael's Parish*, 620 A2d at 1292 (the Dennis Canon codifies the existence of a trust relationship in explicit terms); *The Protestant Episcopal Church in the Diocese of New Jersey v. Graves*, 417 A2d 19, 24 (N.J. 1980) (the Dennis Canon specifies an express trust provision).

[25] (Punctuation omitted.) *Crumbley*, 243 Ga. at 344.

[26] *Carnes*, 236 Ga. at 38-39 (1).

[27] See *Crumbley*, 243 Ga. at 345 (because the local church remained a member of the national church and accepted the benefits flowing from that relationship, it could not later deny the existence of a trust for the benefit of the national church).

[28] In 1978, before the Dennis Canon was enacted, Christ Church sought and received the consent of the Bishop and Standing Committee of the Diocese to sell a rectory on Washington Avenue in Savannah. In 1984, Christ Church again sought and received the consent of the Bishop and the Standing Committee to sell a rectory on East York Street. In 1987, the vestry of Christ Church sought and received permission from the Bishop and the Standing Committee to borrow $950,000 in order to renovate the parish house and to encumber the property located at 18 Abercorn Street to secure that loan.

property in trust for the Diocese of Georgia and the National Episcopal Church.

Christ Church argues that the Dennis Canon was adopted by a flawed legislative process and should not be considered. Specifically, Christ Church claims that the National Episcopal Church, which is an unincorporated association based in New York, is bound by the law of New York, which requires that notice be given prior to any change in its documents. Christ Church points out that the matter came before the General Convention without any advance notice, that it was passed without an opportunity for the parishes to discuss it, and that it was made effective immediately, contrary to long standing practices of the Convention.

First of all, the First Amendment to the United States Constitution precludes this Court from questioning the validity of the process by which the church legislates.[29] "As a matter of constitutional law, a hierarchical religious organization must be permitted to establish the rules and regulations by which it is governed."[30] Thus, other courts have routinely refused to entertain attacks on the process by which the 1979 Trust Canon was adopted.[31] We agree with the Supreme Court of California:

> It is a bit late to argue that [the Dennis Canon] was not effectively adopted, a quarter of a century later, and, in light of the consistent conclusions of the out-of-state cases that that canon is, indeed, part of the Episcopal Church's governing documents, the argument seems dubious at best. But, in any event, this is one of those questions regarding "religious doctrine or polity" . . . on which we must defer to the greater church's resolution. Over the years, the Episcopal Church has consistently taken the position that [the Dennis Canon] was effectively adopted.[32]

If Christ Church had an objection to the validity of the Dennis Canon, the remedy is not with the courts, but rather with the General Convention of the National Episcopal Church.

---

[29] See *Jones*, 443 U. S. at 602 (III) (the First Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization).

[30] *First Born Church of the Living God v. Hill*, 267 Ga. 633, 634 (1) (481 SE2d 221) (1997).

[31] See *Episcopal Church Cases*, 198 P3d at 84 (refusing to consider whether the National Episcopal Church effectively adopted the Dennis Canon because courts must defer to the national church's resolution regarding issues of religious doctrine and internal church governance).

[32] (Citations and punctuation omitted.) *Episcopal Church Cases*, 198 P3d at 83-84.

In addition, courts in New York, the state of residence of the National Episcopal Church, where presumably a direct claim against the efficacy of the canon would be resolved, have specifically held that the Dennis Canon "clearly establish[es] an express trust in favor of the . . . Diocese and the National Church . . . and that [the local parish] agreed to abide by this express trust either upon incorporation in 1927 or upon recognition as a parish in spiritual union with the . . . Diocese in 1947."[33]

Christ Church further argues that its express accession in 1918 was "presumptively revocable under then-governing [departure-from-doctrine] law." Departure-from-doctrine jurisprudence, however, implied a trust upon the local church property for the benefit of the national church on the mere basis of the "connective governmental structure" of the national church, and offered protection for local congregations by conditioning the trust upon the national church's adherence to its tenets of faith.[34] Here, however, the trust interest in Christ Church's property was not implied merely from the fact that it was a parish in a hierarchical church. Rather, as set out in detail above, the trust interest is a long-standing principle that has been expressed in a variety of ways throughout the National Episcopal Church's history and governance, most particularly through its canons governing the use of parish property. These principles were evident both when Christ Church became a parish in 1823 and when Christ Church amended its corporate charter in 1918. Thus, when Christ Church confirmed its accession to the National Episcopal Church in 1918, it had notice of the National Episcopal Church's implied trust over local church property. "In agreeing to abide by all 'canonical and legal enactments,' it is unlikely that the parties intended that the local parish could reserve a veto over every future change in the canons."[35]

More importantly, Christ Church has acted in directed contradiction to its claim that its fealty extended only to 1918. As stated previously, there can be no doubt that Christ Church has always held itself out as a parish of the Diocese of Georgia and a full participant in the affairs of the National Episcopal Church at every level, and it has always adhered to the canons of the National Episcopal Church, even though enacted after 1918.

Christ Church next contends that even if its 1918 charter accepted the trust obligation, the 2006 charter amendments, remov-

---

[33] *Harnish*, 899 NE2d at 925.

[34] See *Presbyterian Church &c. v. Eastern Heights Presbyterian Church*, 224 Ga. 61, 68 (1) (159 SE2d 690) (1968), rev'd on other grounds, *Presbyterian Church &c. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U. S. 440 (89 SC 601, 21 LE2d 658) (1969).

[35] *Harnish*, 899 NE2d at 925.

ing all accession to the Diocese of Georgia and the National Episcopal Church, effectively negated it. This argument is flawed. Although Christ Church is correct that Georgia law which governs nonprofit corporations permits such amendments, the amendment did not have the effect desired by Christ Church. Contrary to its argument, Christ Church cannot amend its way out of an already existing trust. Changes to corporate documents cannot sever the strands of the trust that attached to parish property.

Likewise, Christ Church's reliance on Canon II.8 of the Diocese of Georgia is misplaced. The canon does state that "[n]othing in these Canons shall prejudice the legal rights of any Parish or Vestry already existing by act of incorporation." However, diocesan canons are subordinate to the canons of the National Episcopal Church. To the extent that Diocese Canon II.8 and the Dennis Canon conflict, the Dennis Canon would control.[36]

We recognize that many of the authorities cited in this opinion are from foreign jurisdictions and, therefore, are not binding. Nevertheless, this Court is persuaded by the legal analyses therein and the consistency of the opinions. Christ Church argues that the recent South Carolina case of *All Saints Parish Waccamaw v. The Protestant Episcopal Church &c. of South Carolina*[37] is highly persuasive authority for this case and urges us to adopt the reasoning of the South Carolina Supreme Court. In particular, Christ Church relies on that court's conclusion that a party cannot establish a trust over property that it does not own. However, although there are certain factual similarities between that case and this one, ultimately the decision in *All Saints* is distinguishable, and we decline to adopt its holding in this case.

In this case, it is undisputed that the National Episcopal Church is hierarchical in nature, that Christ Church has been a member of the hierarchical organization since 1823 (for over 180 years), that Christ Church, through its own 1918 charter, made itself subject to the hierarchy's discipline and canons, and that Christ Church ratified its adherence to the National Episcopal Church discipline and canons in 1981 when it re-filed its 1918 charter. Such discipline and canons unquestionably provide that the National Episcopal Church "shall hold all church property," thereby implying a trust for the benefit of the National Episcopal Church. This principle became an express trust with the enactment of the Dennis Canon in 1979.

---

[36] See *The Parish of the Advent v. Protestant Episcopal Diocese &c.*, 688 NE2d 923, 931-932 (II) (Mass. 1997) (the national canons supersede diocesan canons, which themselves supersede a parish constitution).

[37] *All Saints Parish Waccamaw v. The Protestant Episcopal Church &c. of South Carolina*, 685 SE2d 163 (S.C. 2009).

YALE LAW LIBRARY

Taking all of these factors into account, this Court is satisfied that a trust over the property exists in favor of the National Episcopal Church and the Diocese of Georgia. When Christ Church disaffiliated from the National Episcopal Church, the local church property reverted to the control of the Bishop of the Diocese of Georgia for the uses and purposes of the National Episcopal Church. The trial court's order is hereby affirmed.

*Judgment affirmed. Miller, C. J., and Phipps, P. J., concur.*

DECIDED JULY 8, 2010 — 

*Ellis, Painter, Ratterree & Adams, Paul W. Painter, Jr., Simpson & Creasy, Neil A. Creasy*, for appellant.

*Elliott, Blackburn, Barnes & Gooding, James L. Elliott, Gillen, Withers & Lake, Thomas A. Withers*, for appellees.