## A99A1838. ST. MARY OF EGYPT ORTHODOX CHURCH, INC. et al. v. TOWNSEND.
### (532 SE2d 731)

SMITH, Judge.

In this case, transferred from the Supreme Court of Georgia, we revisit the perennial question of the extent to which the courts of this state may address matters in dispute within a church or ecclesiastical body. Here, doctrinal disputes led an archbishop of the Orthodox Church in America ("OCA") to suspend Father John Townsend, the rector of St. Mary of Egypt Orthodox Church of the Diocese of the South of the Orthodox Church in America, Inc. ("St. Mary's"), from his priestly duties. Townsend and some members of the parish then attempted to affiliate the parish with the Russian Orthodox Church Abroad ("ROCA"), and the archbishop and the remaining parish members sought to block that affiliation by recourse to the courts of Georgia. The trial court granted summary judgment sua sponte on the limited issue of control and ownership of the parish corporation and its assets, and the trial court found a jury issue regarding which of the competing groups is entitled to control of St. Mary's property. Because we conclude that the trial court improperly construed the parish corporation to be an autonomous congregational body, we reverse.

For "some years" before 1997, Townsend had been contemplating a withdrawal from the OCA because he opposed what he perceived as heretical changes in its religious and liturgical practices, including the acceptance of nonOrthodox baptisms. After learning of Townsend's rebaptism of his wife, Archbishop Dmitri, Townsend's immediate superior in the church, suspended him on October 24, 1997, "from all sacred functions and service of the holy priesthood" pending a meeting in the forthcoming week. After Townsend responded by letter in lieu of the proposed meeting and declined to remain in communion with the OCA, the archbishop sent a second letter dated November 10:

> It is with heartfelt sorrow that I inform you that as of this day you are relieved of the pastorate of St. Mary of Egypt Orthodox Church of the Diocese of the South of the Orthodox Church in America. You are to cease and desist any and all pastoral and priestly functions at St. Mary of Egypt Orthodox Church of the Diocese of the South of the Orthodox Church in America. You are also to leave the property of St. Mary of Egypt Orthodox Church and its deeded environs.

On the same date, the archbishop replaced Townsend, appointing a temporary rector to St. Mary's, and dissolved the parish council. As

these events unfolded, Townsend instituted a reaffiliation of himself and a group of parishioners to the ROCA.[1] As part of this attempted reaffiliation, Townsend and his adherents attempted to exercise control over the parish corporation, its assets, and property. It is undisputed that this action was taken without a formal vote and without adherence to the corporate procedures in St. Mary's articles of incorporation and bylaws. But Townsend contends that the act of making Confession and Holy Communion at a ROCA-affiliated church "is far more important to the issue of religious affiliation, and thus, has more significance, than a vote being taken."

Appellants, the archbishop and Diocesan Bishop of the Diocese of the South of the Orthodox Church in America ("the Diocese"), the temporary rector designated by the archbishop, the deacon, and other members of the parish, filed this action against Townsend seeking legal and injunctive relief from his actions, including a demand that he be restrained from exercising control over the property of the parish. After discovery, appellants filed a motion for summary judgment.

The trial court entered an order attempting to establish the extent to which the court could intervene in the dispute. Initially, the trial court found that the OCA has a hierarchical form of church government, a finding that is not disputed by either party. But the trial court went on to find, based upon its reading of two provisions in the church documents and two decisions of the Commonwealth Court of Pennsylvania, that the parish corporation was nevertheless an autonomous body with full and exclusive control over corporate property. The trial court accordingly granted summary judgment sua sponte on this issue, concluding that OCA had no control over the parish corporation and that such control belonged solely with the parish. The trial court also found that the trier of fact must resolve whether Townsend's actions and those of the parish council were authorized and constituted a legitimate reaffiliation of the parish. These rulings were in error.

In cases involving disputes over church property, Georgia law recognizes two types of church government: congregational and hierarchical. *Kidist Mariam Ethiopian &c. Church v. Kidist Mariam Ethiopian &c. Church*, 219 Ga. App. 470, 472-473 (1) (465 SE2d 491) (1995). A congregational church is usually an autonomous body strictly independent of other ecclesiastical associations, while a hier-

---

[1] We agree with the trial court that "[w]ithout going into a detailed history of the Orthodox Catholic Church and ensuing schism between various factions of the Church, this court recognizes that the OCA and ROCA have divergent religious doctrines, practices, and beliefs as well as separate ecclesiastical authorities and ruling convocations which are in conflict with one another."

archical church is associated with other churches that share similar faith and doctrine and have a common ecclesiastical head. Id. at 473.

> As a matter of constitutional law, a hierarchical religious organization must be permitted to establish the rules and regulations by which it is governed. *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U. S. 696, 724 (IV) (96 SC 2372, 49 LE2d 151) (1976).

*First Born Church &c. v. Hill*, 267 Ga. 633, 634 (1) (481 SE2d 221) (1997). Under the rules and regulations established by the church, as a hierarchical religious body, it cannot be governed directly by its membership. Id.

> If the church government is congregational, then a majority of its members control its decisions and local church property. If hierarchical, then we use neutral principles of law to determine whether the local church or parent church has the right to control local property. Those neutral principles are state statutes, corporate charters, relevant deeds, and the organizational constitutions of the denomination.

(Citations and punctuation omitted.) *Kidist Mariam*, supra at 473. Accordingly, we must examine the corporate documents and organizational statutes of St. Mary's, as well as the organizational statutes of the OCA, in order to determine whether the right to control local property is vested in St. Mary's or the OCA. See *Leopold v. St. Paul's Greek Orthodox Church*, 235 Ga. App. 188, 193 (509 SE2d 121) (1998).

Archbishop Dmitri, the ruling hierarch and Diocesan Bishop of the Diocese, of which St. Mary's is a constituent parish, identified by affidavit the "Statute of the Orthodox Church in America." This document defines the relationship between the OCA, "the Church," and its member parishes. According to the statute, "No one can be a member of the parish if he openly betrays the teaching of the Orthodox Church." With respect to parish property, the statute provides:

> The parish or parish corporation is the sole owner of all parish property, assets, and funds. In administering them, however, the parishioners and the officers elected by them must always remember the religious nature, purposes, and goals of the parish and act as trustees of God's, not man's, property. The parish, as the whole Church, serves God and cares for God's work in the world, and all decisions concerning parish property must be inspired by that care and by the spiritual needs of the Church.

The first sentence of this provision, standing alone, was relied upon by the trial court in holding St. Mary's corporation to be an autonomous unit. But this sentence must not be read in isolation from the remainder of the section in which it appears, or from the church and parish organizational documents as a whole. The statute also provides:

> The parish is a local community of the Church having at its head a duly appointed priest and consisting of Orthodox Christians who live in accordance with the teachings of the Orthodox Church, comply with the discipline and rules of the Church, and regularly support their parish. *Being subordinate to the Diocesan Authority, it is a component part of the Diocese.*

(Emphasis supplied.) No parish may be established until the bishop of the diocese in which it is located has approved its charter and bylaws. Moreover, "the Bishop is the head of all parishes which constitute his diocese. He appoints parish clergy . . . and in case of conflicts and disorders within the parish, takes all necessary measures consistent with the Holy Canons." The statute further establishes and gives authority to a Diocesan Court "to judge cases involving allegations of unorthodox belief, breaches of canonical or moral discipline, . . . disputes involving clergy and parish officers, disputes over parish institutions, and any other matter involving the good order of the Church."

"The Statutes of St. Mary of Egypt Orthodox Church," provisions adopted for the internal governance of St. Mary's, also affirmatively state the corporation's affiliation: "This Parish is a parish of the Diocese of the South of the Orthodox Church in America, and is under the jurisdiction of the canonical Bishop of that Diocese." The parish statutes further provide: "The Parish will be subject to 'The Statute of the Orthodox Church in America' as adopted by the Second All-American Council of October 19-21, 1971, and as amended at any subsequent All-American Council." Moreover, "[t]he decisions made at Parish meetings will be binding on all Parishioners *after approval by the proper Diocesan authority.*" (Emphasis supplied.) Finally, the parish statutes provide:

> It must be remembered that the Parish is first the "Body of Christ" and as such, there can never be any administrative separation of "spiritual" and "material" matters. Members of the Parish Council must always bear in mind that in all their actions, they are doing "God's work," no matter what form or appearance it may take.

The uniform parish bylaws, issued by the Diocese of the South of the OCA, as amended in 1983, are "standard and obligatory for all parishes of the Diocese of the South." Archbishop Dmitri testified that these bylaws superseded the earlier statutes of St. Mary's. While this supersession apparently is in some dispute, both documents are relevant as they shed light on the intentions of the parties regarding control of the parish corporation.

The uniform parish bylaws provide that "[t]he parish meeting is the highest legislative, judicial and administrative authority of the Parish as a corporation." They also provide:

> The Parish corporation is the sole owner of all Parish property, assets and funds, and these are administered by the Parish Council in accordance with decisions made by the Parish Meeting and with the Statute of the Orthodox Church in America. *Note:* No decision of the Parish Meeting with regard to the property shall be contrary to or in conflict with the provisions of the Statute of the Orthodox Church in America in this respect.

The trial court once again relied upon a selective quotation of a portion of the bylaws, in this case omitting a crucial sentence without an ellipsis. We reiterate that we cannot read a portion of any provision in isolation. Instead, we must consider it as a whole and in conjunction with all other relevant church documents. The bylaws also provide that all decisions and resolutions made by the parish in annual or special meetings shall be sent to the bishop for confirmation and that they do not become effective until receipt of such confirmation.

Most significantly, the articles of incorporation for St. Mary's explicitly affirm the submission of the parish corporation to the hierarchical authority of the OCA, stating:

> The corporation shall be subordinate to and subject to The Diocese of the South of the Orthodox Church in America, and if the said Diocese should become known by another name, then the corporation will likewise be subordinate and subject to the authority of its successor.

The record does not show that these articles have ever been rescinded or amended to remove this provision.

Appellee contends that the church governance is a "hybrid" form akin to the organization in *Kidist Mariam*, supra, i.e., the parish's church affairs are entirely separate from its corporate affairs. This contention is without merit. In *Kidist Mariam*, the corporate documents of the parish *explicitly* separated the affairs of the parish into two categories, religious and corporate. The bylaws "expressly pro-

vide[d] for the corporation's autonomy while specifying that the [parish] must yield to [the parent church's] hierarchical dictates only with regard to religious, spiritual, and liturgical matters." Id. at 473-474. This provision created a hybrid of hierarchical (religious) and congregational (corporate) form of church government.

The church documents at issue here stand in stark contrast to those in *Kidist Mariam*. They do not lend themselves to an interpretation that the parish's corporate existence is separate from its religious duties; indeed, they expressly forbid such a conclusion. The corporate documents themselves declare the corporation to be "subordinate to and subject to the Diocese." The statutes of St. Mary's explicitly state that "there can never be any administrative separation of 'spiritual' and 'material' matters." The uniform parish bylaws, while placing ownership of parish property in the parish corporation, provide that no decision regarding such property shall be contrary to or in conflict with the statute of the OCA; they explicitly require confirmation by the bishop of *any* decision or resolution taken by the parish. The church documents as a whole created a subsidiary parish under the authority of the parent church (OCA) in all matters, not a "hybrid" organization such as that in *Kidist Mariam*.

The trial court's reliance upon *Mikilak v. Orthodox Church in America*, 99 Pa. Commw. 264 (513 A2d 541) (1985), and *Orthodox Church of America v. Pavuk*, 114 Pa. Commw. 176 (538 A2d 632) (1988), is also misplaced. Of course, " 'this Court is not bound by decisions of other states or federal courts except the United States Supreme Court.' [Cit.]" *Nissan Motor &c. Corp. v. Stovall Nissan*, 224 Ga. App. 295, 297, n. 3 (480 SE2d 322) (1997). Moreover, both cases are sharply distinguished by their facts, including the corporate documents at issue. The parish in *Mikilak*, supra at 269, was founded in 1904, and the parish in *Pavuk*, supra at 178, in 1902, long before the "diasporic scattering" of Russian Orthodox clergy and laity as a consequence of the Russian Revolution. *Mikilak*, supra at 268.[2] The parishes were incorporated in 1924 and 1907, respectively, and therefore also pre-existed the recognition and confirmation of the OCA by the Patriarch and Holy Synod of Russia in 1970. The Pennsylvania court found in both cases that the corporate documents made no reference to the OCA but "only to the Russian Orthodox Church generally." *Mikilak*, supra at 274; *Pavuk*, supra at 183. In contrast, St. Mary's was incorporated in 1978, and the corporate documents expressly state: "[t]he corporation shall be subordinate to and subject to The Diocese of the South of the Orthodox Church in America." The Penn-

---

[2] While it is not directly relevant here, *Mikilak* contains a thorough and highly instructive history of the Russian Orthodox Church from 1054 A.D. Id. at 267-269.

sylvania decisions relied upon by the trial court are therefore neither helpful nor persuasive here.[3]

It follows that, under the statute of the OCA, the uniform parish bylaws, and the bylaws and corporate documents of St. Mary's, control of the parish property is placed in the parish corporation, but control of the parish corporation is in its turn placed in the Diocesan authority and under the jurisdiction of the archbishop. As in *Leopold*, supra, there is no question that the members of the local parish are conferred with property rights to the parish property, but they also "voluntarily subject themselves to hierarchical church authority." Id. at 193. We therefore were unauthorized to intervene in a decision by the bishop in *Leopold* regarding the disposition of the parish's property. Id. Similarly, even though ownership of the parish property is vested in the parish corporation of St. Mary's, that corporation by its governing documents, most explicitly by its articles of incorporation, has voluntarily subjected itself to the "hierarchical church authority" of the OCA.

In overlooking this essential point, the trial court effectively contradicted its finding that the OCA is a hierarchical church by declaring the parish an autonomous congregational body. This result inadvertently but inevitably brings the Georgia courts into the heart of an ecclesiastical dispute, a position we are eminently unqualified to take and are forbidden to take by the constitutional safeguard of separation of church and state. *First Born Church &c.*, supra at 634 (1).

We therefore conclude that the trial court erred in finding a jury issue as to whether Townsend and his adherents are members in good standing with the power to participate in the affairs of the corporation. Townsend had, as a result of the declaration of the archbishop, no power to take any of the actions here in issue. Any judicial interference with the decision of the archbishop would constitute an impermissible intrusion into the internal religious affairs of the OCA. *Leopold*, supra at 193. The courts of Georgia cannot interfere in the archbishop's decision, and the trial court erred in so finding. The judgment of the trial court is therefore reversed and this case is remanded for further proceedings consistent with this opinion.

---

[3] We find more persuasive such decisions as *Bishop &c. of Colorado v. Mote*, 716 P2d 85 (Colo. 1986). In *Mote*, the Colorado Supreme Court relied in part upon Georgia law in applying a "neutral principles" analysis to the departure of an Episcopal parish from its hierarchical parent church. Id. at 95-99. Applying this analysis in a "general inquiry as to the locus and nature of control in the local organization," id. at 102, the court examined, as we do here, the articles of incorporation, the parish bylaws, and the "canons" or statute of the parent church. Id. at 104. It concluded that, although no explicit trust was created by any formal document, the church documents as a whole showed "an intent on the part of the local church corporation to dedicate its property irrevocably to the purposes of" the parent church. Id. Here, of course, trust language does appear in the statute of the OCA.

*Judgment reversed and case remanded. Pope, P. J., and Miller, J., concur.*

DECIDED MARCH 28, 2000 —

*Christie, Toreno & Hatcher, Carrie L. Christie, Vincent A. Toreno, E. R. Lanier,* for appellants.
*Drew, Eckl & Farnham, W. Wray Eckl, Anne M. Landrum,* for appellee.