A10A1611, A10A1612. TIMBERRIDGE PRESBYTERIAN
CHURCH, INC. v. PRESBYTERY OF GREATER ATLANTA, INC.
(two cases).
(705 SE2d 262)

SMITH, Presiding Judge.

In these appeals transferred from the Supreme Court of Georgia, we must once again venture into the thorny and contentious arena of church property disputes. The issue presented here is whether a church corporation and its property are controlled by Timberridge Presbyterian Church, Inc. ("Timberridge"), a local church which has voted to disaffiliate from the Presbyterian Church (USA) ("PCUSA"), or controlled by the Presbytery of Greater Atlanta, Inc. ("the Presbytery"), the regional body representing PCUSA. Because the application of "neutral principles of law" to all the relevant documents does not demonstrate that the regional body has the right to control the local church corporation or its property, the trial court erred in granting summary judgment in favor of the Presbytery. We therefore reverse the judgment of the trial court.

The relevant facts are not generally disputed by the parties. Timberridge Presbyterian Church was founded as an unincorporated association in 1829. In 1880, Timberridge became affiliated with the Presbyterian Church in the United States ("PCUS"), sometimes called the "southern church." In the early 1980s, a union was proposed between PCUS and the United Presbyterian Church in the U.S.A. ("UPCUSA"). The union officially occurred in 1983, forming the PCUSA. Timberridge was incorporated as Timberridge Presbyterian Church, Inc. in 1984. The PCUSA allowed member churches a period of eight years after its formation to opt out of certain provisions in its Book of Order pertaining to local church property, and in 1987 Timberridge attempted to exercise this option, although PCUSA contends that attempt was ineffectual.

In 2007, Timberridge filed a complaint for declaratory judgment and petition for injunction seeking a declaration with regard to the existence of any trust in its property in favor of the Presbytery or the PCUSA. Approximately two weeks later, PCUSA filed an answer and counterclaim seeking injunctive relief and bad faith attorney fees. About two months after that, Timberridge voted to disaffiliate from the PCUSA. The Presbytery then filed a separate action in ejectment seeking a writ of possession, damages, and injunctive relief forbidding Timberridge from using the name "Timberridge Presbyterian Church" or controlling the church corporation.

The parties filed cross-motions for summary judgment, and the trial court entered substantially identical orders in both actions, declaring that an express trust was created by the property trust provision of the PCUSA Book of Order and that Timberridge and its members and pastor no longer had the authority to control the church corporation. Both cases were appealed to the Georgia Supreme Court, and then transferred together to the Court of Appeals. Because we agree with the trial court that the same principles of law apply to both cases, we have consolidated them for purposes of appeal.

1. In Timberridge's first enumeration of error, it complains that the trial court erred in its application of the "neutral principles of law" analysis of the property dispute.

> It is well settled that civil courts cannot intervene in doctrinal disputes within a church. However, where a church property dispute can be resolved without regard to the doctrinal disputes, a court is authorized to render a decision that enforces the legal rights of the parties. Georgia law recognizes two basic types of church government: congregational and hierarchical. A congregational church is strictly independent of other ecclesiastic associations and owes no fealty or obligation to any higher church government authority. If the church government is congregational, then a majority of its members control its decision[s] and local church property. A hierarchical church, on the other hand, is "organized as a body with other churches having similar faith and doctrine with a common ruling convocation or ecclesiastical head." If a church is hierarchical, then we must use "neutral principles of law" to determine whether the local church or parent church has the right to control local property. Neutral principles of law include state statutes, corporate charters, relevant deeds, and the organizational constitutions and bylaws of the denomination.

(Citations and footnotes omitted.) *The Rector &c. of Christ Church v. Bishop of the Episcopal Diocese of Ga.*, 305 Ga. App. 87, 88 (699 SE2d 45) (2010). In applying this "neutral-principles approach," we look to the intention of the parties as provided in the deeds, corporate charter, or constitution, and "give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." *Jones v. Wolf*, 443 U. S. 595, 606 (III) (99 SC 3020, 61 LE2d 775) (1979).

Here, the parties do not dispute that the PCUSA is hierarchical,

as distinguished from congregational, in government.[1] We therefore apply neutral principles of law in examining the relevant statutes, applicable deeds, and the corporate and organizational documents of the local church as well as those of the national denomination to determine the intention of the parties. *St. Mary of Egypt Orthodox Church v. Townsend*, 243 Ga. App. 188, 190 (532 SE2d 731) (2000).

(a) *Relevant Statutes*. The parties agree that OCGA § 14-5-46 is relevant here, but disagree as to its precise application and whether it controls the issue before us. That Code section provides:

> All deeds of conveyance executed before April 1, 1969, or thereafter for any lots of land within this state to any person or persons, to any church or religious society, or to trustees for the use of any church or religious society for the purpose of erecting churches or meeting houses shall be deemed to be valid and available in law for the intents, uses, and purposes contained in the deeds of conveyance. All lots of land so conveyed shall be fully and absolutely vested in such church or religious society or in their respective trustees for the uses and purposes expressed in the deed to be held by them or their trustees for their use by succession, according to the mode of church government or rules of discipline exercised by such churches or religious societies.

The Presbytery asserts that the final sentence of this Code section mandates that the national rules of the PCUSA exclusively control the disposition of local church property. But we cannot read that sentence in isolation from the remainder of the section, which is limited on its face to "deeds of conveyance." And nothing in the language of the Code section limits its application to the rules of the *national* church.

We may not consider such rules as the exclusive or dispositive factor in determining the control of the property at issue. In applying neutral principles of law as required by the United States Supreme Court and the Supreme Court of Georgia, we cannot ignore relevant statutes, documents of the local body, or the actual language of the relevant deeds, in favor of the rules of the national body. The narrow approach urged by the Presbytery would result in a de facto "rule of compulsory deference to religious authority in resolving church property disputes, even where no issue of doctrinal controversy is involved," as disapproved by the United States Supreme Court in *Jones v. Wolf*, supra, 443 U. S. at 605 (III).

---

[1] Some decisions refer to the "hierarchical" form of church government as "connectional," but the same test applies. *Carnes v. Smith*, 236 Ga. 30, 32 (1) (222 SE2d 322) (1976).

We conclude that OCGA § 14-5-46 is to be read in harmony with the principles established for the resolution of church property disputes: We apply neutral principles of law to "the intents, uses, and purposes contained in the deeds of conveyance," as well as "the mode of church government or rules of discipline exercised by such churches or religious societies," on the local, regional, and national level as those pertain to the property at issue.

We must also consider the application of the Georgia Trust Act, OCGA § 53-12-1 et seq., as that chapter governs the creation and interpretation of trusts. The Presbytery asserts, and the trial court held, that the provisions of Georgia trust law relied on by Timberridge are inapplicable and that OCGA § 14-5-46 exclusively controls church property disputes. But

> [a]ll statutes are presumed to be enacted by the General Assembly with full knowledge of the existing condition of the law and with reference to it, and are therefore to be construed in connection and in harmony with the existing law, and as a part of a general and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the Constitution, but also with reference to other statutes and decisions of the courts.

(Citations and punctuation omitted.) *Ga. Public Defender Standards Council v. State of Ga.*, 284 Ga. App. 660, 663 (2) (644 SE2d 510) (2007).

Nothing in OCGA § 14-5-46 abrogates any other provision of Georgia law; rather, by its terms it refers to the validity of deeds of conveyance "for the uses and purposes expressed in the deed," not to the imposition of a trust in favor of any use or purpose as expressed in other documents. The only reference to a trust in the statute is to a deed "to trustees for the use of any church or religious society," but the deeds at issue here do not convey the property to trustees, nor to the Presbytery or PCUSA, but simply to "Timberridge Presbyterian Church" or "Timberridge Presbyterian Church, Inc." OCGA § 14-5-46 therefore cannot be applied here without reference to other statutory and case law, particularly where the imposition of a trust is alleged in the absence of any reference in the deeds.

In addition, while the trial court concluded that *Crumbley v. Solomon*, 243 Ga. 343 (254 SE2d 330) (1979), and *Carnes v. Smith*, 236 Ga. 30, 32 (1) (222 SE2d 322) (1976), supported an exclusive consideration of OCGA § 14-5-46 because neither case cites OCGA § 53-12-20, that conclusion is erroneous. Those decisions do not cite the express trust provisions now codified in OCGA §

53-12-20[2] because those cases involved *implied* trusts. See *Crumbley*, 243 Ga. at 345 (trust implied for benefit of general church); *Carnes*, 236 Ga. at 39 (1) (implied trust intended by founders of local church in favor of national denomination). And in *Carnes*, upon which *Crumbley* relied, 243 Ga. at 345, the Georgia Supreme Court explicitly declared that it considered the Georgia statutes governing *implied* trusts, former Ga. Code Ann. §§ 108-106 and 108-107.[3] *Carnes*, supra, 236 Ga. at 37 (1). For these reasons, we do not limit our consideration of statutory law to the provisions of OCGA § 14-5-46.

The applicable version of OCGA § 53-12-20 provided in pertinent part:[4]

> (a) An express trust shall be created or declared in writing.
> (b) An express trust shall have each of the following elements, ascertainable with reasonable certainty:
> (1) An intention by a settlor to create a trust . . . .

These requirements are entirely consistent with determining the intention of the parties by applying neutral principles of law to all the relevant deeds, statutes, constitutions, and charters of the local and national churches.

*(b) Deeds.* Having determined the applicable statutes, we now turn to the relevant deeds of conveyance. As noted in Division 1 (a), above, the deeds at issue here do not convey the property to trustees, nor to the Presbytery or PCUSA, but simply to "Timberridge Presbyterian Church" or "Timberridge Presbyterian Church, Inc." The language contained in deeds can be significant, and even controlling in certain circumstances. In *First Evangelical Methodist Church v. Clinton*, 257 Ga. 459-460 (1), (2) (360 SE2d 584) (1987), the Georgia Supreme Court considered the language of two deeds as dispositive in determining the ownership of church property, reaching different results as to each deed. The first deed conveyed property to trustees "in connection with the affiliations aforesaid" with a connectional church. The court held that the deed vested title in the connectional church, and when the local church severed its

[2] The statutes pertaining to trusts were extensively revised and renumbered in 1991 as the Georgia Trust Act. The provisions of OCGA § 53-12-20 were found in relevant part in former Ga. Code Ann. §§ 108-104 and 108-105.

[3] The language of former Ga. Code Ann. § 108-106 has been adopted in part in OCGA §§ 53-12-90 through 53-12-93, and that of former Ga. Code Ann. § 108-107 in part in OCGA § 52-12-93.

[4] OCGA § 53-12-20 was amended in 2010 to add a requirement that the writing be signed by the party to be charged.

relationship with that church it "forfeited its right of use and possession." Id. at 460 (1). But as to a second deed which contained no trust language and no restriction regarding its use, "the application of neutral property principles must yield a contrary result," and the court held the conveyance was to the local church and the parcel remained its property. Id. at 460 (2).

Timberridge asserts as controlling here the general rule that "the intent of the parties must be determined from the deed's text alone." *Second Refuge Church &c. v. Lollar*, 282 Ga. 721, 725 (2) (653 SE2d 462) (2007). As we observed above with respect to the Presbytery's contentions that the "mode of church government or rules of discipline" language of OCGA § 14-5-46 is dispositive, such an approach is too narrow and does not comport with the neutral application of legal principles to the facts of this case. We must consider all relevant documents. But the absence of any trust language in the deeds, whether to local trustees or in favor of the Presbytery or the national church, weighs against the creation of a trust.

*(c) Local Church Documents.* We next consider the effect of the corporate documents of Timberridge. The trial court held that the references in the Timberridge Articles of Incorporation to the PCUSA and to its Book of Order "evidence a clear intention that the church corporation was formed in accordance with the PCUSA Book of Order to be the civil arm of a PCUSA Church . . . and that it subjected itself to the rules of governance of the PCUSA by referencing the PCUSA Book of Order." Based on this analysis, it also held that the corporation was a PCUSA entity and that the members, pastor and elders of Timberridge were no longer authorized to control the corporation. In so doing, the trial court relied upon our decision in *St. Mary*, supra, 243 Ga. App. 188. We disagree with both of these findings.

In *St. Mary*, the local parish adopted uniform parish bylaws that were issued by the diocese and were "standard and obligatory for all parishes" in the diocese. Id. at 192. Those bylaws provided that no parish decision "with regard to the property shall be contrary to or in conflict with" the national church statutes, and that "all decisions and resolutions made by the parish in annual or special meetings shall be sent to the bishop for confirmation and that they do not become effective until receipt of such confirmation." Id. And, "[m]ost significantly, the articles of incorporation for St. Mary's explicitly affirm the submission of the parish corporation to the hierarchical authority of the OCA, stating: 'The corporation shall be subordinate and subject to The Diocese of the South of the Orthodox Church in America.' " Id.

Here, in contrast, the corporate documents do not express such

clear intent to render the local church corporation subject in all matters both ecclesiastical and temporal to the authority of the Presbytery or PCUSA. The trial court correctly observed that Timberridge's articles of incorporation *"reference* the PCUSA, the presbytery[,] and the PCUSA Book of Order and provide that the bylaws of the corporation shall not be inconsistent with the PCUSA Book of Order." (Emphasis supplied.) But the only references in the articles of incorporation are (1) that Timberridge is "a church institution which is a member of the Presbytery of Atlanta of the Presbyterian Church (USA) or any successor Presbytery thereof," (2) that "active members" will be defined as in the Book of Order of PCUSA, (3) that any bylaws enacted in the future shall not conflict with the Book of Order, and (4) that upon dissolution of the corporation its assets may be disposed of as directed by "the Presbytery of which the Church is then a member."[5] These provisions do not express any intent to create a subsidiary corporation under the complete control and authority of the parent church as in *St. Mary.*

*(d) National Documents.* Finally, we consider the effect of the organizational constitutions and bylaws of the denomination. Section G-8.0701 of the Book of Order of the PCUSA provides:

> The provisions of this chapter shall apply to all particular churches of the Presbyterian Church (U.S.A.) except that any church which was not subject to a similar provision of the Constitution of the church of which it was a part, prior to the reunion of the Presbyterian Church in the United States and The United Presbyterian Church in the United States of America to form the Presbyterian Church (U.S.A.), shall be excused from that provision of this chapter if the congregation shall, within a period of eight years following the establishment of the Presbyterian Church (U.S.A.), vote to be exempt from such provision in a regularly called meeting and shall thereafter notify the presbytery of which it is a constituent church of such vote. The particular church voting to be so exempt shall hold title to its property and exercise its privileges of incorporation and property ownership under the provisions of the Constitution to which it was subject immediately prior to the establishment

---

[5] This last provision, as well as applying only when the corporation is dissolved, would seem to contemplate a possibility that the corporation might in the future change its membership, as it does not use the "successor" language of the first article.

of the Presbyterian Church (U.S.A.). This paragraph may not be amended.

In 1987, four years after the formation of PCUSA, Timberridge voted at its annual meeting to "take the exemption as provided in the Book of Order." The CEO of Timberridge testified that the minutes were approved by the Moderator of the Session[6] and recorded and the Presbytery "was duly notified of Timberridge's vote to opt out of the trust provision contained in Chapter 8." This was done by letter dated November 18, 1987, stating: "the Congregation of Timberridge Presbyterian Church voted to take the 'property exemption' as provided in the Book of Order (G-8.0700)."

The former PCUS did not have a trust provision in its Book of Church Order until immediately before the merger that formed PCUSA in 1983. A provision was added to the former PCUS Book of Church Order of 1982/1983 that is identical to § G-8.0201 in the PCUSA Book of Order, but for the omission of language referring to the PCUSA, its subdivisions and its governing body:

> § 6-3. All property held by or for a particular church, whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of the particular church or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church in the United States.

The Presbytery urges that this amendment prevented Timberridge from opting out of the property trust provision, since Timberridge was "subject to a similar provision of the Constitution of the church of which it was a part prior to the reunion" of PCUS and UPCUSA to form PCUSA, and that Timberridge is therefore bound by the property trust provision. While acknowledging that it received Timberridge's letter, the Presbytery through its administrative head states that it does not "interpret the November 18, 1987 letter as an exemption from the property trust clause." Instead, it contends that Timberridge opted out of a different provision of the PCUSA Book of Order which was not included in the PCUS Book of Church Order:

> Nothing in this chapter shall be construed to require a particular church to seek or obtain the consent or approval

---

[6] The session is the governing body of a local Presbyterian church. PCUSA Book of Order G-7.0103.

of any church court above the level of the particular church in order to buy, sell or mortgage the property of that particular church in the conduct of its affairs as a church of the PCUS.

The PCUSA Book of Order, in contrast, requires the permission of the Presbytery to "sell, mortgage, or otherwise encumber any of its real property" or acquire property subject to an encumbrance.

Once again, however, this approach of focusing narrowly on a single document does not comport with the application of neutral principles of law to *all* the relevant documents. The Presbytery asserts that its interpretation of the property trust provision must control, and that Timberridge failed in its effort to opt out and instead opted out of a different provision. But we are not considering the import of the opt-out provision in isolation. Rather, we look at all the relevant documents to determine whether the parties evidenced an *intent* to create a trust and gave it "some legally cognizable form." *Jones v. Wolf*, supra, 443 U. S. at 606 (III).

The Presbytery attempts to supply evidence of Timberridge's assent to an express trust in the form of an affidavit from its Associate Stated Clerk, identifying the minutes of the meeting of the Presbytery of Atlanta at which the amendments to the PCUS Book of Church Order were voted on, and stating that the minutes reflect that Timberridge delegates were present at the meeting, that a vote was called on amendments to the Book of Church Order, "including amendments to the 'Church Property' provisions of the Book of Church Order," and that the amendments passed. But the minutes merely reflect that several amendments headed "Chapter 6, Form of Government on 'Church Property'" were voted on, without identifying the contents of any provision or the section of Chapter 6 to be amended. This affidavit does not establish that any representative of Timberridge voted for any particular amendment, was aware of the details of the property trust provision, intended to assent to it, or actually gave assent on behalf of the church. Similarly, while an affidavit from a former pastor of Timberridge states that Chapter 6 of the PCUS Book of Church Order was amended during his tenure to add the property trust clause, he does not state when he became aware of this amendment or that his knowledge was communicated to the members or elders of Timberridge.

Most importantly, none of this material provides evidence that Timberridge was aware of or assented to the adoption of the PCUSA opt-out clause or the exception it contained with respect to a local church's previous Constitution. But even if it could be inferred from this evidence that Timberridge was aware of changes in the PCUS Book of Church Order and the resulting effect on the opt-out clause

of the PCUSA Book of Order, an arguable inference is not sufficient to establish an express trust. The documents must show with "reasonable certainty" an intention on the part of Timberridge to create an express trust, OCGA § 53-12-20 (b), and they do not. Rather, all the evidence "declared in writing" points towards an intention on the part of Timberridge to opt out of the property provisions of the PCUSA Book of Order, even if that attempt was only partially successful.

Read as a whole in light of the relevant law, the evidence is inadequate to show the existence of a trust in favor of the Presbytery. The evidence must reveal that "factors other than mere connectional relationship between a local and general church were present." *Carnes*, supra, 236 Ga. at 35 (1). In the absence of some showing of intention and assent on the part of Timberridge, neutral principles of law cannot support the unilateral imposition of a trust provision drafted by the purported beneficiary of the trust and the resulting deprivation of the opposing party's property rights.

In addition, the absence of a property trust clause in the PCUS Book of Church Order until immediately before the reunion of PCUS and UPCUSA and the fact Timberridge's operation without a property trust provision for nearly 200 years are facts that distinguish this case from our earlier decisions and those of the Georgia Supreme Court in which local churches explicitly adopted express trust provisions and took no action to challenge them for extended periods of time. For example, in *Christ Church*, supra, 305 Ga. App. 87, an express trust was established by the national church in 1979, and the local church re-recorded its charter in 1981, reaffirming its "accession to the doctrine, discipline, worship, constitution and canons" of the national church after adoption of the express trust provision. Id. at 96 (3) (b). Moreover, the local church "failed to take any steps to disavow the canon or attempt[ ] to remove itself from the reach of . . ." the express trust provision during a 30-year period after its adoption. The local church "repeatedly sought the canonically-required consent of the Diocese of Georgia before alienating real property or incurring indebtedness, including two times after adoption of the Dennis Canon in 1979." Id. This was in addition to our holding that the local church had been subject to an implied trust from 1823. Id. at 93 (3) (a). See also *Crumbley*, supra, 243 Ga. at 345 ("We note that Franklin Tabernacle participated in making this disciplinary rule and did not contest its validity for 30 years.")

Here, in contrast to *Crumbley* and *Christ Church*, Timberridge promptly attempted to opt out of the newly created property trust provisions. While the national church adopted rules "codifying the trust relationship," *Christ Church*, supra, 305 Ga. App. at 94 (3) (a), the local church has not undisputedly "adopted or adhered to those

rules" with respect to the property at issue, id., but rather has "taken steps to disavow" the provision and attempted "to remove itself from the reach of" the trust provision, id. at 96 (3) (b), regardless of whether that attempt was successful under the precise wording of the interlocking church documents. No intent has been demonstrated on the part of the purported grantor of the trust to place its property in trust. In fact, the evidence shows that Timberridge took every possible step to express its intention *not* to create a trust.

*(e) Conclusion.* It is undisputed that the deeds are silent regarding any trust in favor of the Presbytery or the national church, that the local church's documents are silent regarding any creation of a trust or naming of a trustee, and that the local church attempted to opt out of the property trust provisions of the PCUSA Book of Order within the time frame provided for that process. Applying neutral principles of law, and bearing in mind OCGA § 53-12-20 and its requirement of both a writing and intention on the part of the settlor to create a trust, we must conclude that the Presbytery has not presented evidence demonstrating with reasonable certainty an intention on the part of Timberridge to create a trust in its favor. The trial court therefore erred in granting summary judgment to the Presbytery.

2. The trial court also erred in holding that the Presbytery controls the local corporate entity itself. As discussed in Division 1, neutral application of legal principles to the local church documents, the PCUSA Book of Order, and the relevant statutes does not demonstrate such control by the Presbytery over the church corporation.

3. In light of our rulings in Divisions 1 and 2, above, the Presbytery's action in ejectment in Case No. A10A1612 is also without merit. Timberridge's final enumeration of error therefore is moot.

*Judgments reversed. Mikell and Adams, JJ., concur.*

DECIDED NOVEMBER 30, 2010 — ▮▮▮▮▮▮▮▮

*Talley, French & Kendall, Michael C. Kendall, Maureen E. Murphy,* for appellant.

*Wilson, Morton & Downs, Robert E. Wilson, Debra A. Golymbieski,* for appellee.

*Baker, Donelson, Bearman, Coldwell & Berkowitz, David H. Gambrell, Linda A. Klein, John Hinton IV,* amici curiae.